Robert ELLIOTT and Shirley Elliott, Plaintiffs-Appellants,

v.

MAGGIOLO CORPORATION et al., Defendants-Appellees.

Nos. 917, 1352, Docket 75–7016, 75–7041.

United States Court of Appeals, Second Circuit.

Argued June 26, 1975.

Decided Sept. 12, 1975.

Gerald Orseck, Edelman, Berger, Peters & Koshel, Liberty, N. Y., for defendants-appellants.

Lester E. Fetell, Sergi & Fetell, John J. Langan, Brooklyn, N. Y., for plaintiffs-appellees.

Before CLARK, Associate Justice,* MANSFIELD and MULLIGAN, Circuit Judges.

CLARK, Associate Justice:

The appeal in this suit for personal injury based upon negligence involves a jury verdict and judgment for $350,000 in favor of Robert Elliott, plaintiff-appellee, and $28,000 for his wife, Shirley, on her derivative claim. Jurisdiction in the United States District Court for the Eastern District of New York was based upon diversity of citizenship, 28 U.S.C. § 1332. Appellants, Maggiolo Corporation, Maggiolo Contracting Co., Inc., Maggiolo Foundation Corporation, G & A Contracting Corporation, and Ronnie Gorr [Maggiolo], raise four points of error in their challenge of the verdict and judgment. Appellants claim prejudicial conduct of appellees' trial counsel, error

in the exclusion of certain proffered impeachment evidence, prejudice with reference to the presence in the courtroom during the trial of appellees' children, and finally, error in the refusal of the court to grant a mistrial. We find no reversible error in any of the points, and affirm the judgment.

1. *Background of the Trial:*

The case was tried to a jury from November 25, to December 12, 1974, and the record of its proceedings covers some 2500 pages, with sixteen witnesses, 89 Exhibits and five depositions.

The appellee, Robert Elliott, was an employee of the Village of Woodbridge, New York, in its road maintenance department. On April 24, 1972, at about 11:30 a.m., he was cleaning a storm drain or catch basin on Glen Wild Road when a red colored Ford 10-wheel truck loaded with debris and other demolition material approached him. He turned his body so as to face the truck as it passed when suddenly he was struck across the side of his face by a board or plank which became dislodged from the debris piled upon the truck. The resulting injuries cost Elliott the loss of the use of his left eye through blindness; the loss of his hearing in his left ear through deafness; head and brain damage; and multiple scars on his left side of his face, nose, and head. The Elliotts offered two principal witnesses on the cause of the accident—Joe Schact, an eyewitness to the accident, and David Utegg, a driver of one of Maggiolo's trucks. The eyewitness, who lived near the scene of the accident, testified that after he had given Elliott a shovel to use in cleaning out the storm drain on Glen Wild Road he was watching Elliott at the drain in the street when a 10-wheel dump truck loaded with debris and demolition material came along Glen Wild Road passing by Elliott and obscuring the latter from his view. Schact heard a scream and after the truck passed Elliott he saw Elliott on the ground near the drain with a plank

---

* Associate Justice, United States Supreme Court (Ret.) sitting by designation.

beside him. The other witness, David Utegg, testified by deposition taken on July 5, 1972, some 2½ months after the accident. He testified that on the date of the accident he drove one of Maggiolo's red Ford 10-wheel dump trucks. He stated that he drove back and forth over Glen Wild Road and past the scene of the accident, while delivering debris and demolition material from an urban renewal project to a dumping ground near Glen Wild Road.

Other evidence corroborated the basic elements of Schact's and David Utegg's testimony. The trip cards made in the regular course of Maggiolo's business indicated that on the date of the accident four red 10-wheel dump trucks of Maggiolo's carried 34 loads of debris and demolition material from the renewal project to the dump yard and 20 loads of sand as well. The trucks moved along Glen Wild Road on continuous trips taking some 40 minutes for each trip and were obliged to pass the scene of the accident on each trip, going and coming.

Furthermore, a witness for the Maggiolos, Irving Newmark, Superintendent of Public Works for the Village of Woodbridge, testified concerning important elements of plaintiffs' case. He stated that Elliott was on the date of the accident cleaning mud and sand from the storm drains that had washed there from the urban renewal area project. Newmark further testified that he had received word of the accident and had investigated it, finding that a board from a passing truck was involved in the accident. On cross-examination, Newmark for the first time during his examination produced his personal notebook in which he had made notations of his investigation of the accident in his own handwriting. One of the notations made on the day of the accident recorded: "Bob (Elliott) said a board fell off one of Maggiolo's dump trucks and hit him while he was cleaning catch basins."

It was Maggiolo's defense that none of its trucks were on Glen Wild Road at the time and place of the accident; that they worked only in the afternoon on that date; that Elliott's claims were fabricated; that he suffered neither total disability nor unemployability, such claims being exaggerations, not supported by competent evidence, and made "out of the whole cloth." On appeal, Maggiolo contends Elliott's entire "trial approach was to obtain a favorable verdict, by foul means or fair. Hard proof lacking, plaintiff's trial counsel substituted technique, guile, disingenuousness, feigned naivete, etc. for proper conduct, all to the prejudice of the defendants."

While the trial does seem quite bizarre at times, we find no evidence in the record to support Maggiolo's charges of "foul means," "fabrication," paucity of proof, or prejudice. Admittedly there was some unfairness on both sides, but even in the courtroom fire is often fought with fire. As much as we abhor such tactics in a trial, it seems to us that here "the kettle is calling the skillet black." In short, there was reprehensible conduct on both sides.

On reading the record one cannot doubt the cause and the extent of Elliott's injuries. The recovery allowed by the jury was not so monstrous as to indicate that prejudice was present in the minds of the jury when determining liability and fixing the amount. On the contrary, Maggiolo does not even attack the jury's award. We find that hard proof was present and that it led directly to the findings of Maggiolo's liability, the Elliotts' damage, and appropriate recovery on the personal injury claim.

2. *Maggiolo's Points of Error:*

■ (a) Appellants claim that the overall conduct of Elliott's trial counsel in attempting to bridge the lack of direct proof of the plank falling from a Maggiolo truck and striking Elliott in the face was so unfair and prejudicial that reversal is required. Specifically, Maggiolo says this paucity of proof was bridged entirely by innuendo, supposition, arithmetic and circumstantial evidence, all held tenuously together by improper reference to matters excluded by the trial judge, false accusations, disin-

genuous statements, planted histories, courtroom facial grimacing, cute children displayed in the courtroom, and the full panoply of an advocate's arts, wiles and guile.

First, Maggiolo refers to the "planted" medical history that was worked into the reports of the various doctors and received as testimony during the trials. An examination of this evidence does demonstrate some contradictions. For example, Dr. Salvatore Consentino who examined Elliott soon after the accident reported: "Accident. Hit in face by a plank which fell off a passing truck while working." This testimony was admitted into evidence without any objection. Thereafter in a compensation claim report Dr. Hyman O. Immerman (who was Dr. Consentino's partner) reported this statement of Elliott in his medical history: "A board hit me in face while working on the truck." Defendants introduced the compensation claim report into evidence. Thereafter, Dr. Ralph Peimer testified as a treating physician and reported this medical history:

"That he was injured on April 24 of 1972, at about 11:30 in the morning; that he was cleaning a storm drain, that a passing truck veered and lost some debris from the top of it and he was hit on the left side of his face by . . . yes, one by six inch plank."

Likewise Dr. Henry T. Gaynin, the eye specialist, testified:

"He (Elliott) told me that on 4/24/72 while on a highway he was struck by a plank which fell from a truck."

However, in a report to Elliott's counsel on October 13, 1972, Dr. Gaynin stated:

"I was given a history that on 4/24/72 while working for the Village of Woodbridge, Sullivan County, he was struck by a plank that was stored on a truck that passed on the highway."

Maggiolo also showed that Dr. Gaynin changed his office record on Elliott from "compensation case" to "liability."

Maggiolo further says that a letter of October 14, 1972, from Elliott's counsel to Dr. Gaynin is or "vital significance." It is dated one day after the above medical history report and reads:

"At the time of the accident he (Elliott) was standing on the road cleaning a clogged drain, when a truck loaded with debris, boards and planks came by. A plank or board *extending beyond the body of the truck hit him in the face* as the truck went by causing him to suffer serious head and facial injuries." (Emphasis supplied.)

But Dr. Seymour Bessen reported to Elliott's counsel on September 11, 1972, that "while at work a passing truck, loaded with debris, had a board fall off striking patient on the left side of the face." Dr. Bessen had been on duty at the emergency room that Elliott went to about 2 hours after the injury. At trial Dr. Bessen was asked: "Could you please tell us what the history was?" He replied:

"The history was that he was working at the side of the road. There was some urban renewal work going on in Woodbridge and there was a truck with some debris that passed, a board fell from the truck and he was struck by the board on the side of the face."

Maggiolo's point is that "the later *expanded* history furnished by the *attorney*, it becomes obvious . . . was planted, *in anticipation of trial.*" Maggiolo refers to Dr. Gaynin's letter of October 14, 1972. However, if this assumption be true it was certainly bungled. The letter erroneously recites that the board, rather than falling from the truck, extended beyond its body and hit Elliott in the face as the truck went by.

Even with all this confusion about the admission of "planted" histories, an occurrence late in the trial resolves the problem of prejudice. Contrary to the specific instruction of the trial judge "that what the patient told the doctor cannot be used to support the plaintiff's version of how this accident happened," counsel for Elliott in his summation contended that the medical history of the doctors confirmed Elliott's testimony as

to how the accident occurred. Although the court, on objection of appellants, repeatedly warned counsel for Elliott not to so use the medical histories, he again referred to it. On further objection, the court excused the jury and asked appellants' counsel, "Do you want a mistrial?" Appellant's counsel answered: "Let me put my comment on the record, I have to get it off my chest," and the court said, "I am ready for it, Mr. Edelman (Elliott's counsel)." Whereupon appellants' counsel said that he did not want a mistrial. "I will rely," he said, "on your Honor to correct it in your charge, if you can. I trust that you will."

While such conduct on the part of Elliott's counsel was most reprehensible and, as the trial judge commented, was done for the obvious purpose of "trying to prove liability through inadmissible proof" we believe that the strong reprimand of the court and its instruction to the jury, as requested by appellants, not to consider the evidence, foreclosed any prejudice to appellants. But even if this not be true, appellants waived the point when they refused to accept the mistrial offer of the court. Now, after the jury verdict has been returned against appellants, they cannot change their trial tactics. They had a fair chance to take a mistrial and refused it. As appellants' counsel himself said, "That became a legal judgment" and cannot now be cast aside after the "die is cast."

In this connection, we find the affirmative evidence quite sufficient to support the verdict. The testimony of Elliott and Schact, supported as it was by the notation in Newmark's personal notebook, and the testimony of David Utegg is hard evidence of liability. The jury gave this testimony full credit, despite the testimony to the contrary of several defense witnesses. Determination of disputed facts and conclusions concerning the credibility of conflicting testimony are functions solely within the province of the jury:

"Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1945). Here there was more than sufficient evidence to support the jury's conclusions.

■ (b) The next point appellants raise is a charge that David Utegg told his brother Harold that he had not told the truth in his original deposition and, further, that he would be in the hospital and unavailable on trial day. Appellants insisted the only way to expose this "fraud" was to bring David into court. It appeared, however, that the trial date was set unexpectedly and David was already in the hospital before the setting. Nevertheless, the trial judge ordered that a second deposition be taken of David and this was done. However, David stood by his original testimony and declared that it was not true that he told his brother Harold that his testimony was false at the first deposition or that he told Harold that he would change it if possible. He also denied telling Harold that he would feign sickness and escape appearance at the trial of the case. Nevertheless, at the trial Maggiolo produced Harold Utegg and placed him on the stand in an effort to impeach David.

First Harold testified about conflicting statements made by David to his counsel in Harold's presence. Then, Harold was asked whether he had a conversation with David after the latter's first deposition. Receiving an affirmative answer, counsel asked: "What did he tell you about it?" On objection, Harold was not permitted to reply on the ground of hearsay. Maggiolo's counsel then passed up a paper to the judge inquiring orally whether he might ask Harold "those questions now." The judge refused. The paper was not marked and is not before us and we do not know of its content. It appears, however, that Harold had already testified before the jury that David had told Elliott's counsel at a pretrial interview, held in the presence of Harold, that he (David) had not driv-

en the truck on Glen Wild Road on the morning of the accident. As the trial court pointed out upon denying appellants' post-trial motions:

"The court also notes that Harold Utegg did testify that David Utegg told plaintiffs' (Elliott's) counsel in Harold's presence that he did not drive the truck down Glen Wild Road on the morning of April 24, 1972. Plaintiffs' counsel made no objection to this testimony and it was admitted in evidence. Under such circumstances, it is difficult to see how Maggiolo was substantially prejudiced by the court's refusal to admit David Utegg's prior inconsistent statement."

We agree that the exclusion of whatever contrary testimony Harold intended to offer would have been harmless. The fat was in the fire. He had in effect told the jury that David was a liar and the jury refused to believe him. In addition, David's testimony was given full credit despite the attacks upon it by all of the other Maggiolo drivers.

■ But even if this was not true, there was no foundation laid for Harold's second attempt to impeach David. The general question posed: "What did he (David) tell you about it" does not meet the requirements of Rule 43(c) F.R. Civ.P. as to offers of proof. Given the fact that Harold had already testified as to David's previous inconsistent statement, it was necessary for the offer of proof to show that this was new matter.

(c) Finally, appellants repeat their plea for a mistrial placing it on the whole record rather than on the medical history incident alone. But as we have indicated, the trial court offered appellants a mistrial, after all of the evidence was in, and they refused it. We see nothing in the other claims of misconduct. They seem to be the usual histrionics that trial counsel often indulge in especially where the case is hotly contested. The charge the appellants made against the Elliott counsel was a fighting one which, if substantiated, would have led inevitably to criminal charges

or at the least disbarment proceedings. However, we find no hard proof of fabrication, planted histories (the doctors denied it), "foul means or fair" techniques, or false claims of unemployability. There was specific defiance of the trial court's orders but appellants forgave such transgressions in refusing the court's offers of mistrial.

The judgment is therefore affirmed.

Affirmed.