Jesse De La ROSA, Petitioner-Appellant,

v.

STATE OF TEXAS, Respondent-Appellee.

No. 84–1362.

United States Court of Appeals, Fifth Circuit.

Oct. 9, 1984.

Rehearing Denied Nov. 27, 1984.

---

Ronald P. Guyer, San Antonio, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Enforcement Div., Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before REAVLEY, RANDALL and WILLIAMS, Circuit Judges.

REAVLEY, Circuit Judge:

A Texas jury found Jesse De La Rosa guilty of committing capital murder in the course of a robbery and determined that he would probably "commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Proc. Ann. Art. 37.071 (Vernon 1981). The trial court then sentenced De La Rosa to death pursuant to article 37.071(e). After a hearing, the trial court denied a motion for new trial. The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal, *De La Rosa v. State*, 658 S.W.2d 162 (Tex.Crim.App.1983) (en banc), and the Supreme Court denied a petition for writ of certiorari. —— U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 175 (1983). The trial court scheduled De La Rosa's execution for April 27, 1984. He petitioned for a writ of habeas corpus and for a stay of execution, which were denied on April 13, 1984. Ten days later the Texas Court of Criminal Appeals denied a stay and habeas relief. De La Rosa applied in federal district court for a stay and for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which were denied on April 24, 1984. The next day the district court issued a certificate of probable cause, and this court granted a stay of execution so that De La Rosa could address the merits of his appeal. We now affirm the district court's denial of habeas relief.

## I. Facts

In the early morning of August 22, 1979, De La Rosa and a companion robbed two convenience stores in San Antonio. With a .32 caliber pistol, De La Rosa shot the clerk at each store. At the 7-11 store Masoud Ghazali, age 27, died from two wounds to his head. At the Stop & Go store, Patricia Johnson was also shot twice, but she survived to identify De La Rosa. His fingerprints were found on a beer can near the cash register at the 7-11 store, and another print was taken from the door handle of the cooler in which Ghazali's body was found. De La Rosa confessed to these crimes.

## II. Admissibility of the Confession—Miranda

### A. Erroneous Explanations

De La Rosa does not claim that he did not receive *Miranda* warnings. Rather, his principal contention is that police officers, after reading the standard *Miranda* rights card, proceeded to explain what the recited language meant in a manner that was misleading and inadequate. De La Rosa argues that the paraphrased *Miranda* warnings improperly linked his right to have an attorney to some point in the future. *See, e.g., United States v. Garcia*, 431 F.2d 134 (9th Cir.1970). He also suggests that his intelligence, evaluated as between borderline retarded and dull normal, heightened the inadequacy of the warnings because he could not fully understand the formal, recited language and therefore relied on explanations. De La Rosa ultimately argues that he made no knowing waiver of his rights prior to making his confession.

The findings to the contrary by the state district judge are supported by overpowering evidence. Several police officers possessing an arrest warrant entered a house, looking for De La Rosa. De La Rosa exited through a rear window, to encounter and be arrested by Officer Vaquera. De La Rosa was handcuffed and taken to a police car. Vaquera was carrying a card with *Miranda* rights printed in English and in Spanish. He first read De La Rosa the warnings in Spanish, and then repeated them in "street-type Spanish" to ensure that all was understood.

Detective Michalec, who had known De La Rosa for several months, then took over, reciting the *Miranda* warnings in English. Michalec also explained De La Rosa's rights in "common everyday language." After De La Rosa was taken to the police station, Michalec asked him if he wanted to give a confession and he replied that he did not know. Michalec asked him if he wanted an attorney present, and De La Rosa said that he would rather talk to

his brother, who was also at the police station in another room. After De La Rosa met with his brother and a friend, he told Michalec that he wanted to tell him everything. Michalec initially took a statement about the shooting and robbery at the Stop & Go store, and then typed up a second statement concerning the Ghazali killing. Before each statement, Michalec again read *Miranda* rights to De La Rosa, who later signed each statement before two witnesses.

The state trial court found that De La Rosa knowingly, intelligently, and voluntarily waived his *Miranda* rights and that he was never mistreated, threatened, coerced, or promised anything. The court concluded that he freely confessed to the capital murder of Ghazali.

Dr. Charles Bisbee, a psychologist called by De La Rosa, testified that his verbal I.Q. indicated borderline intelligence, falling above mentally retarded but below dull normal. Bisbee stated that an examination of De La Rosa revealed no thought disorder. He indicated that De La Rosa would have difficulty comprehending written *Miranda* warnings, but that he would understand them better, although not completely, if given orally. Bisbee also stated that De La Rosa could understand the warnings if they were explained to him in simple language.

Dr. Betty Schroeder, a psychologist called by the prosecution, gave *Miranda* warnings to De La Rosa in a test situation. She stated that he understood them completely then and would have comprehended them at the time of his arrest, even under stress. She tested De La Rosa on the Wechsler Adult Intelligence Test; his verbal I.Q. was evaluated as borderline, and his performance I.Q. was "well within normal limits."

De La Rosa's brief focuses on testimony by Michalec that, while explaining *Miranda* rights, he stated that "it will take some time" before a lawyer would be appointed. Because of this statement, De La Rosa argues that this case is like others in which *Miranda* explanations were ruled in-

adequate because "the right to appointed counsel was linked to some future point in time after the police interrogation." *California v. Prysock*, 453 U.S. 355, 360, 101 S.Ct. 2806, 2810, 69 L.Ed.2d 696 (1981) (per curiam). *See United States v. Garcia*, 431 F.2d 134 (9th Cir.1970) (per curiam); *Lathers v. United States*, 396 F.2d 524, 534–35 (5th Cir.1968).

We disagree. The cases De La Rosa relies on share the deficiency that the *Miranda* warnings failed "effectively [to] convey to the accused that he is entitled to a government-furnished counsel here and now." *Lathers*, 396 F.2d at 535; *see, e.g., Gilpin v. United States*, 415 F.2d 638, 640–41 (5th Cir.1969). For example, in *Garcia*, "[o]n no occasion was a warning given fully complying with *Miranda*." 431 F.2d 134. "The warnings failed adequately to inform Garcia of her right to counsel before she said a word." *Id.* Similarly, in *Lathers*, the message "indicated only that a judge or commissioner somewhere down the line would appoint a lawyer for him if he so requested." 396 F.2d at 535.

By contrast, the warnings given to De La Rosa were not characterized by this deficiency. Officer Vaquera informed him in Spanish, "You have a right to have a lawyer present to advise you before and during any questioning by police officers or attorneys representing the State." De La Rosa was also told: "You may have your own lawyer present or if you are too poor to hire a lawyer, the court will appoint a lawyer for you free of charge now or at any other time." Detective Michalec gave him the same warnings in English. We cannot accept the position that would have us ignore the repeated full and accurate warnings to focus only on the remark that appointing an attorney would take some time. The cumulative effect of the repeated incantations of *Miranda* and explanations in simpler language was such that De La Rosa was fully informed of his constitutional rights. This case is governed by *California v. Prysock*, 453 U.S. 355, 356, 101 S.Ct. 2806, 2807, 69 L.Ed.2d 696 (1981), and not by cases in which "the reference to

appointed counsel was linked to a future point in time after police interrogation." *Id.* at 360, 101 S.Ct. at 2810.

■ The state trial court found as historical fact that De La Rosa was given *Miranda* warnings along with explanations four times before he confessed. This finding has far more than fair support in the record, and is entitled to a presumption of correctness under 28 U.S.C. § 2254. *See, e.g., Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Maggio v. Fulford,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam).

**B. Delay In Appearing Before The Magistrate**

Police officers arrested De La Rosa at approximately 5:30 p.m. on August 27, 1979 and they arrived at the police station about 30 minutes later. Detective Michalec took the first confession between 6:45 p.m. and 8:00 p.m., and the second between 8:00 p.m. and a little after 10:00 p.m. De La Rosa was taken before the magistrate for an initial appearance at approximately 10:30 p.m. De La Rosa claims that the delay in appearing before the magistrate was unreasonable, rendering his confession inadmissible.

The night magistrate was scheduled to come on duty at 8:00 p.m. De La Rosa concedes that no magistrate was available until that time, but contends that Michalec should have then stopped taking the confession and gone before the magistrate. Michalec testified that, in accordance with practice, he did not interrupt the confession to take De La Rosa to a magistrate.

■ Even assuming that the time gap between arrest and initial appearance was unreasonable, the claim does not rise to constitutional significance. The Supreme Court has long held that Rule 5(a), Fed.R. Crim.P., is not imposed on the states by the Fourteenth Amendment. *See Culombe v. Connecticut,* 367 U.S. 568, 600–01, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961); *Brown v. Allen,* 344 U.S. 443, 476, 73 S.Ct. 397, 417, 97 L.Ed. 469 (1953); *Gallegos v. Ne-*

*braska,* 342 U.S. 55, 63–64, 72 S.Ct. 141, 146–47, 96 L.Ed. 86 (1951); see also *Smith v. Heard,* 315 F.2d 692, 694 (5th Cir.), *cert. denied,* 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963).

As a constitutional matter, we must determine only whether any delay was causally related to the giving of the confession. The trial court found that De La Rosa confessed of his own free will, unaffected by any threat or coercion. The Texas Court of Criminal Appeals held that the confession was not the result of any delay in taking De La Rosa before a magistrate. 658 S.W.2d at 166–67. In our reading of the record we find nothing to indicate that De La Rosa's confession was anything other than the product of his free and voluntary choice.

**III. In the Jury Room**

De La Rosa contends that he was deprived of due process because he was denied a fair and impartial jury. He claims that statements made by certain jurors during sentencing deliberations caused him to receive the death penalty, based not on the evidence, but on personal juror bias and on improper statements concerning the likelihood of parole for a life-sentenced prisoner. We hold that De La Rosa's Sixth Amendment right to a fair trial guaranteed by the Fourteenth Amendment was not infringed and that the post-trial hearing was adequate to reveal that no juror was biased.

After sentencing, attorneys for De La Rosa moved for a new trial, alleging that improper remarks were introduced during jury deliberations during the sentencing phase. Specifically, two jurors mentioned that a life sentence did not mean imprisonment for life because of the possibility of parole. Moreover, another juror, Elmo Franklin, revealed that he had a stepfather who, after being released from prison on a murder charge, killed again and was sent back to prison. In response to the motion, the trial court ordered a hearing.

Every juror testified at the hearing. Six jurors remembered some discussion of parole. Seven jurors remembered Franklin's

mention of his relative's experience. Three jurors indicated that he had said that it was easier to kill a second time. Most jurors recalled that the comments occurred before the verdict was reached in the sentencing phase. One or two jurors testified that the statements were made after the final vote. Every juror testified that the extraneous comments had no effect in his or her deliberative process and that he or she reached a decision based solely on the evidence presented at trial.

## A. The Possibility of Parole

■ During closing argument of the punishment phase, counsel for De La Rosa told the jury that "by your verdict [i.e., guilty of capital murder], you have found that [De La Rosa] is to spend the rest of his life in the Texas Department of Corrections, a life sentence." Later, De La Rosa's attorney invoked the "horror of life in the Texas Department of Corrections" to show the adequacy of a life sentence. "Ladies and gentlemen of the jury, this is not a case in which society is going to be exposed to the presence of Jesse De La Rosa .... He is condemned to spend the minimum, the rest of his life in the Texas Department of Corrections .... [P]unish Jesse De La Rosa by making him forfeit his freedom for the rest of his life but do not, I beg you, do not make him forfeit his life."

Because defense counsel opened the door, the prosecutor addressed the possibility of parole:

> It's not proper for the State to talk about the Board of Pardons and Parole and what they do, but when she misleads the jury or in law they say "opens the door." I just don't want you to be misled in thinking that the life sentence necessarily means that the person spends the rest of his life in prison because that is strictly up to the Board of Pardons and Parole and you can't talk about what they do or how they decide it. But I didn't want you to be misled about that and I want you to remember that when you think about the proper disposition in this case.

At the post-trial hearing juror Helen Davis testified that the only recollection she had of parole being mentioned in the jury room was after a juror indicated that a life sentence meant that De La Rosa would automatically be in prison for life. She said that that was not necessarily true, but that it was up to the Board of Pardons and Parole. Juror Ethel Hester also stated that whether a life sentence meant "life forever in prison" was up to the Parole Board and that a life-sentenced prisoner could get out on parole. Although she was not sure of the time a prisoner must serve before being considered for parole, she indicated that it could be after five or seven years. Both jurors recalled no other discussion of parole.

Mike Hrncir, who served as jury foreman, testified that he "instructed them that as far as we know and as far as we're concerned, that the sentence of life meant life and we can't consider anything else because we were not the Board of Pardons and Parole." He emphasized that parole had no bearing on the issue and that the jury could not do anything about it. After another isolated comment, Hrncir again admonished the jury. "After I told them life meant life, it was dropped, the issue was not considered any more or discussed."

Under Texas law, "not every mention of parole during jury deliberations calls for reversal." *McCartney v. State*, 542 S.W.2d 156, 162 (Tex.Crim.App.1976). Only jury misconduct that deprives the defendant of a fair and impartial trial warrants granting of a new trial. De La Rosa failed to make that showing. Even if the discussion of parole had been far more intense, we would have difficulty in deciding the likely advantage or disadvantage to the defendant. Clearly in the present case there was no objectionable effect against constitutional assurances.

## B. The Killer Stepfather

On direct appeal De La Rosa argued that the conviction should be reversed because juror Franklin withheld information during voir dire. The Court of Criminal Appeals

held that no question was calculated to bring out the information that Franklin allegedly withheld. In his state habeas petition, De La Rosa argued that Franklin held a highly prejudiced opinion that motivated him to withhold information and that De La Rosa was thereby precluded from exercising a challenge for cause pursuant to article 35.16(a)(9), Tex.Code Crim.Proc. Ann. (Vernon 1966), or a remaining peremptory challenge. The trial court rejected the claim, adopting the reasoning of the state appellate court—Franklin did not withhold information, no juror misconduct occurred, and no new evidence was received by the jury. 658 S.W.2d at 164–65.

On appeal from the federal district court's denial of habeas relief, De La Rosa now argues that Franklin's statement concerning his stepfather's experience during jury deliberations demonstrates that Franklin was actually biased and that such prejudice denied De La Rosa of his right to a trial by a fair and impartial jury.

▮ We cannot conclude that juror Franklin harbored actual bias merely because he omitted mentioning the story about his stepfather. The interrogation of Franklin during voir dire cannot be viewed as necessarily eliciting information concerning that experience. We have no indication that Franklin was dishonest when he answered that there was no reason whatsoever that he could think of that would keep him from being a fair and impartial juror. As noted by the Texas Court of Criminal Appeals, the question that came closest to eliciting the relevant information was a two-part question asked by the prosecutor.

> "Have you ever had the occasion to be interested in the outcome of a criminal case? Have you ever had a particular case that caught your eye and you followed it, and watched the papers, and read about it?"

The answer to this question was:

> "Well, I can't recall anything that I followed through. I read occasionally but just didn't follow through on it."

It is apparent that the second question qualified or replaced the first, and that

the juror answered the second question, not the first. It does not appear there was a diligent effort to learn whether the juror had any relative who had been convicted of a crime. The juror did not *withhold* facts about his stepfather (who had died approximately thirty years before).

*De La Rosa,* 658 S.W.2d at 165.

When defense counsel asked Franklin whether he had any close friends or associates involved in law enforcement, he mentioned that his grandson's uncle was on the San Antonio police force. In response, defense counsel noted that Franklin was being very thorough with his answers. Franklin later replied that he had no associations that would affect his ability to serve on the jury and that he would be able to render a verdict according to the law and the case. After mentioning that his house had been burglarized, Franklin indicated that such an incident would not cause him to have any special feelings that would affect him in rendering a verdict. At the end of defense counsel's voir dire, Franklin affirmed that he would be true to the law and to the facts. He later told the trial judge that he understood that his verdict was to be based on the evidence heard from the witness stand under oath and nothing else.

At the hearing on the new trial motion, Franklin admitted that he related the story about his stepfather, but noted that it was a casual remark made in conversation. Foreman Hrncir testified that he indicated to Franklin that such a comment was not appropriate. No further discussion ensued.

The trial judge denied the motion for new trial without comment, as provided by article 40.07, Tex.Code Crim.Proc.Ann. (Vernon 1979), which does not permit any summation, discussion, or comment on the evidence in granting or refusing a new trial. This curious procedure would invite problems if a simple denial could as well have been based upon one finding as another and where the choice between the alternatives affects the resolution of a constitu-

tional claim. In the present case, by looking to De La Rosa's contentions and to Texas law, the trial court's denial of the motion for new trial after the hearing must be taken as deciding that no extrinsic evidence was introduced during jury deliberations and that no jury misconduct occurred depriving De La Rosa of a fair and impartial trial. *See, e.g., McIlveen v. State*, 559 S.W.2d 815, 819–20 (Tex.Crim.App.1977).

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer [v. United States*, 347 U.S. 227, 74 S.Ct. 450 [98 L.Ed. 654] (1954),] and held in this case.

*Smith v. Phillips*, 455 U.S. 209 at 217, 102 S.Ct. 940 at 946, 71 L.Ed.2d 78 (1982).

■ This is not a case in which we presume juror prejudice, *see e.g., Willie v. Maggio*, 737 F.2d 1372, 1378–81 (5th Cir. 1984); *United States v. O'Keefe*, 722 F.2d 1175, 1180 (5th Cir.1983), nor is it an exceptional case requiring application of an "implied or inferred bias" doctrine, *see Rushen v. Spain*, — U.S. —, —, n. 3, 104 S.Ct. 453, 456 n. 3 (1983); *Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 948–49 (1982) (O'Connor, J., concurring); *United States v. Winkle*, 587 F.2d 705, 715 n. 20 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). This jury was initially cloaked with a presumption of impartiality. *See O'Keefe*, 722 F.2d at 1179; *Winkle*, 587 F.2d at 714. Because De La Rosa demonstrated a colorable showing of extrinsic influence, the trial court properly investigated the alleged impropriety by conducting a hearing. *See id.* It was incumbent upon De La Rosa to prove the existence of juror prejudice by a preponderance of the evidence. *See McMillon v. Estelle*, 523 F.2d 1249 (5th Cir.1975); *United States v. Robbins*, 500 F.2d 650, 652–54 (5th Cir. 1974); *Williams v. United States*, 418 F.2d 372, 376–77 (10th Cir.1969). The extensive hearing, with all jurors testifying, did not reveal prejudice or bias against De La Rosa. The trial judge implicitly found either that no jury breach had been demonstrated or that the prosecution demonstrated the harmlessness of the breach, if any, to De La Rosa. In light of the hearing and the denial of the motion for new trial, the brevity of the statements, and the foreman's corrective instructions, we do not perceive any genuine possibility that De La Rosa was prejudiced during the sentencing deliberations.

## IV. Conclusion

Finding no constitutional error, we must deny habeas relief. The judgment of the district court is AFFIRMED; the stay of execution is VACATED.