UNITED STATES of America, Plaintiff,

v.

Michael H. O'KEEFE, Defendant.

Crim. No. 82–110.

United States District Court, E.D. Louisiana.

March 15, 1983.

John Volz, U.S. Atty., Robert J. Boitmann, Fredericka L. Homberg, Asst. U.S. Attys., New Orleans, La., for plaintiff.

Camille F. Gravel, Jr., William H. Jeffress, Jr., Helen G. Roberts, Alexandria, La., for defendant.

CASSIBRY, District Judge:

On February 5, 1983, the jury in this case returned verdicts of guilty on one count of mail fraud and two counts of obstruction of justice against the defendant, Michael H. O'Keefe. On February 18, 1983, a local news station aired a story suggesting, inter alia, that one of the jurors "knew about O'Keefe's first trial and conviction." [1] After due consideration and in response to a motion of the defendant for an in camera evidentiary hearing under the supervision of the court, I determined to bring in the twelve jurors and question them about the possibility of outside influence on their deliberations. With both sides present, this hearing was held in chambers on February 28, 1983. [2]

### The Scope of the Inquiry [3]

Rule 606(b) of the Federal Rules of Evidence limits the competency of juror testimony in the following manner:

> Most jurors candidly admit they want to forget about the twelve hours of deliberation. They say it was a trying ordeal. Mrs. Earthalea Ross told News Scene Eight she prayed and when it was over the jury did the right thing. Another juror, Clifford Baker of Reserve, says the jury's decision to convict O'Keefe was most difficult. "He received a fair trial," Baker says, "and I support the verdict rendered." Pierre Degruy, News Scene Eight.

---

1. The full text of the February 18 broadcast was:

   First Announcer: In the second trial of State Senate President Michael O'Keefe [a juror] may have had prior knowledge of the first conviction.
   Second Announcer: Pierre Degruy has an exclusive report on this controversy.
   Pierre Degruy: News Scene Eight recently spoke with five of twelve jurors about their deliberations in Senator Michael O'Keefe's trial. He was convicted earlier this month on mail fraud and obstruction of justice charges. One juror has now revealed what could be startling information. He does not want his identity revealed. Our source told us he overheard a comment shortly after jury deliberations finished. Our source says, quote, "One juror knew about O'Keefe's first trial and conviction. The person made a remark that the first jury did not understand the case but our jury did." Our source declines to identify the juror who made the statement but the conversation was verified by one other juror.
   Three other jurors say they did not hear any such comment. Our source says the comment disturbed him at the time but now he doesn't feel the remark affected the deliberations or necessarily the verdicts. "I feel there was no misjustice done," he said, "O'Keefe got a fair trial. I don't think the juror lied to get on the jury; he could have found out about the first trial sometime after this trial began."

2. A transcript of the hearing was sealed and made a part of the record in this case. All citations in the form of (Tr. [pg. #] ) refer to this document.

3. At the threshold, the government urges that the defense waived any rights in this area when, at the charge conference, it "specifically waive[d] any request that the jury be polled at this time on whether they have been exposed to any publicity during the trial." (Transcript of proceedings, February 3, 1983). The government's seemingly straightforward proposition opens a Pandora's box of complex issues, however. For example, would a juror's overhearing of a conversation which contained information that was "publicity" after the first trial, i.e., Senator O'Keefe's remarks about housewives, be subsumed under a waiver concerning the juror's "exposure to publicity during trial?" To answer

(b) INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT.— Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

In accordance with this rule, the Fifth Circuit has considered the proper scope of a district court's inquiry in a proceeding of this nature.

The evidentiary inquiry before the district court on remand must be limited to objective demonstration of extrinsic factual matter disclosed in the jury room. Having determined the precise quality of the jury breach, if any, the district court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant.

*United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975). My questioning of the jurors was guided by the essential distinction in this area of the law between extraneous information and a juror's mental processes. Though some jurors inevitably mentioned the workings of their mind or the effect something had on them, I attempted to confine their answers as much as possible to the issue of whether improper extraneous information was somehow injected into the jury's deliberations.

*The Incident*

Based on the jurors' responses under oath and my assessment of each juror's credibility, I have made the following findings of fact:

1. After a verdict had been reached on all three counts and the jury had returned to the jury room, Mrs. Bell made a comment which contained a reference to a statement made by Senator O'Keefe after his first trial in July had ended in three guilty verdicts. The statement was "something to the effect that housewives didn't understand business ... about the first trial that the housewives didn't understand it but we understand it, or something of that nature." (Tr. 9)[4]

2. Mrs. Bell made her comment once and only once—after deliberations were over. Although two of the jurors, Mrs. Peters and Mrs. Verda, said that the remark had been made during deliberations, based on my observation and evaluation of their testimony I find they were mistaken.[5]

that question in this case, I would have to decide somehow whether "during trial" modified "exposed" or "publicity," and, perhaps, whether the term "publicity" encompasses a conversation about a subject of public interest and record overheard in a public place, e.g. a streetcar.

Because I have found no evidence that extrinsic information was improperly disclosed in the jury room, I have not attempted to resolve fully this semantic maze; nonetheless, I raise it for the appellate court's possible determination.

I believe it is true that *if* the defendant had requested a polling of the jury on the issue of publicity, *then* the incident concerning Mrs. Bell would have been discovered. During voir dire, in the "publicity stage" of the questioning, my questions were not limited to knowledge obtained from newspapers and television, but began with "what, if anything, have you heard about this case?" If a polling had been requested, I can think of no reason why I would not have asked a similar question, one broad enough presumably to encompass Mrs. Bell's situation.

4. The actual quotation, as reported in the New Orleans Times-Picayune of July 3, 1982, was:

"I think the jury was as fair a jury as we could get from that panel," said O'Keefe, adding, however, "The law says you are entitled to be tried by a jury of your peers. That jury was made up of housewives who did not have high school educations."

"That jury was not made up of lawyers involved in the real estate business."

"A housewife would have had a hard time grasping the situation," said O'Keefe.

5. See discussion, infra.

3. Mrs. Bell learned of the defendant's remark during the course of the trial—after the jury's selection but before their deliberations. She overheard a conversation on the streetcar in which the defendant's "housewives" comment was mentioned.[6]

4. Apart from the "housewives" comment, there was no hint or suggestion that any other extraneous matter had come to the attention of the jury at any time.

5. Over the course of the trial and the deliberations in this case, no juror—including Mrs. Bell—*knew* that Senator O'Keefe had been convicted in his previous trial.

*Discussion*

1. Seven jurors remembered hearing the "housewives" comment. Of that number, four jurors (Owens, Bell, Baker, Ramirez) testified that the comment was made after deliberations were over. Two jurors (Peters, Verda) stated that the comment was made during deliberations. And one juror, Mrs. Ross, believed the "housewives" were mentioned during the trial itself.[7]

For several reasons, I have concluded that Mrs. Bell's comment was made after the jury's verdict had been rendered. First, and most obviously, twice as many jurors recalled the comment being made at this time.[8] Secondly, both the person who made the comment and the person to whom the comment was apparently directed (Owens, the foreman)[9]—the two people most "engaged" in the conversation—remembered that the comment was made after the verdict. Moreover, I found these jurors—the "after-verdict" jurors—more credible than the "during-deliberations" jurors. In particular, I was impressed with the acuity of the foreman Owens and Mr. Baker.[10]

2. Of the seven jurors who recalled the incident, not one suggested that the statement had been made on two separate occasions.[11] Nor did anyone suggest that they heard the statement in a one-on-one conversation (which would have left open the possibility of the statement being made several times). On the contrary, Mr. Owens surmised "that probably all of them heard

6. Mrs. Bell recalled the incident in this manner:
I was on a streetcar and these ladies were talking and I was sitting behind her just before I got off the streetcar she was talking about the O'Keefe trial and she said, well, they were talking about the first trial, the first jurors were ladies and they were all housewives and then it was my turn to get off the streetcar. (Tr. 70–1).

7. Mrs. Ross: ... it may have been one of the witnesses that said it and it may have been one of the attorneys but that statement was made in the open, in the courtroom. (Tr. 76–7).
It is a matter of record that Senator O'Keefe's remark about "housewives" was never alluded to by any witness or attorney during trial.

8. I completely discounted Mrs. Ross' testimony on this point. See note 7, supra.

9. Tr. 9.

10. As stated, the remark was apparently made to Owens and had been prefaced with the statement, "I'm going to make you feel better." (Tr. 9) His was the fullest description of the comment and the attendant circumstances. Though, in the courtroom, Owens incorrectly pointed out Ms. Edwards as the person who made the comment (Tr. 19), Owens did recall that the speaker was a black lady who had been seated in the first row, fourth chair of the jury box—which was precisely correct (Tr. 12). Owens was certain that the "housewives" comment was uttered after deliberations.

As for Mr. Baker, when he heard the remark,
It was something, somewhat unintelligible to me, but it was being communicated, it didn't make much sense, very much sense to me because it was not said in an intelligent manner enough for me to get a clear understanding of what was being said... It had something to do with Senator O'Keefe's statement about the last jury, but precisely what the statement was, as I said, it was somewhat unintelligible to me but mainly I guess because I did not have the background knowledge. (Tr. 41–2).
At the hearing, it was clear that the perplexing nature of the statement had focused Mr. Baker's attention on it; like Owens, he too was certain that the comment had been made after the verdict had been rendered.

11. Mrs. Bell indicated that another juror had made the remark contemporaneously with her comment. There was no other evidence to support a second comment, however.

her say it." (Tr. 12). Mrs. Verda stated that "it just came up and several people agreed." (Tr. 60). And Mrs. Peters recalled that, at the time, "there was a lot of conversation." (Tr. 35). Having found that the statement was made but once and that it was made after deliberations, it necessarily follows that the statement could not have been made during deliberations as well.

Nevertheless, Mrs. Peters and Mrs. Verda remembered just that. I did not, however, find their version of the incident credible insofar as the time when the statement occurred was concerned.

Besides the fact that four jurors remembered events differently, there were two main reasons to question Mrs. Peters' testimony. First, she admitted that "I really wasn't paying too much attention to it." (Tr. 33). Mrs. Peters stated that "guess" was her "pet word" (Tr. 35) and, unlike Mr. Baker who was somewhat struck by the "housewives" comment, it did not seem that Mrs. Peters had concerned herself when the comment was made. More importantly, however, Mrs. Peters was the *only* juror who remembered that someone had also mentioned the verdict of the previous trial during deliberations (Tr. 35). This was patently incorrect, as no other juror remembered hearing or making such a remark. Mrs. Peters' perceptions about this incident were, quite simply and innocently, inaccurate.

The same holds for Mrs. Verda. At one point, this colloquy occurred between the court and Mrs. Verda:

Mrs. Verda: ... The only thing—can I tell you what I heard mentioned?

The Court: During the trial?

A: Yes, sir.

Q: And before the verdict?

A. Not before the verdict.

Q. After the verdict?

A. It was during deliberations.

Q. During the deliberations.

A. But, I think it was mentioned in the defense's presentation, whatever that was.

(Tr. 59–60). "Not before the verdict," "during deliberations," in the defense's presentation"—Mrs. Verda's recollection of this incident was slippery at best. Though she ultimately averred that the comment had been made during deliberations, she had no idea if it was on the first, second, or third day of those deliberations.[12] When weighed against the testimony of the four jurors who heard the comment after the verdict, Mrs. Verda's testimony was not persuasive.

3. There is no evidence to contradict Mrs. Bell's testimony that she overheard a conversation on the streetcar in which the "housewives" statement was mentioned. Though counsel for the defense suggested that "there has to be more to it than that" (Tr. 72, remarks of Mr. Gravel), I fail to see why this "has to" be. Certainly, the situation did not sound illogical or improbable, and—though it was unfortunate for Mrs. Bell to be in the wrong place at the wrong time—without more, I did not see the need to cross-examine Mrs. Bell extensively on this point.

4. At the hearing, no one raised the spectre of any other extraneous information that might have been improperly brought before the jury. (Mrs. Peters stated that the verdict in the previous trial was mentioned as well, but this mentioning was linked to the "housewives" comment.)

5. During voir dire, I questioned each prospective juror individually and thoroughly about their knowledge of Senator O'Keefe and the pre-trial publicity in this case. Without going into detail as to each juror's responses, suffice it to say that none of the people who finally served on the jury had any prior knowledge that the defendant had been convicted in a previous trial.

Once the trial began and during the course of the trial, the only *possible* extraneous information which could have come

12. The jury deliberated Thursday evening, Friday, and Saturday morning.

to the jury's attention was the "housewives" comment. However, to reiterate, this comment was made after the jury had finished its deliberations. Furthermore, no comment was made before or during deliberations to the effect that the defendant had been convicted in a previous trial, and Mrs. Bell swore that she did not possess such knowledge. In sum, there is not one scintilla of evidence to suggest that any juror *knew*—in the sense of finding this from some improper, outside source to be a *fact*—that the defendant had been convicted once before.

Having said as much, I am faced with the statements by Mrs. Peters and Mrs. Verda that they "found out" what they could not "know". Mrs. Peters felt that another juror had mentioned the previous verdict, yet this portion of her testimony was wholly rebutted by the other jurors. Mrs. Verda was exceedingly vague and inconclusive about the "source" of her knowledge. She said the previous verdict was definitely not mentioned. (Tr. 65). At one point, she stated that her conclusion about the defendant's earlier conviction was based on the "housewives" remark (Tr. 63); at another, "from the proceedings in court" (Tr. 61); and, at still another, "I know at some point in time I got to this assumption but I don't remember exactly when I heard it." (Tr. 63).

With the finding that no "extraneous information" affected the jury's deliberations, it is not within my province to explore with Mrs. Peters and Mrs. Verda how they concluded during deliberations (if indeed they did) that the defendant had been convicted once before. I can, however, suggest one plausible train of events. For, in response to the lengthy voir dire questions posed to each juror by the court, the defense thereafter decided that an instruction about the previous trial should be given. The government acceded to this request, and, on the first or second day of trial, I instructed the jury as follows:

> Ladies and gentlemen, as some of you may have gathered before or during the questions that were asked of you during the past couple of days, this case has been tried once before, some months ago.

The result of that trial has no bearing whatsoever on this case. The fact that the case was previously tried, and the reasons that we are trying it again, is absolutely irrelevant to you, and you must put it out of your mind and give it no thought whatsoever. Is there any juror who has any doubt in his mind that he or she can and will follow this instruction?

From the moment I gave this instruction, the entire jury knew of the previous trial. From then on, a juror could easily have drawn the inference that the defendant had been convicted, but that something had upset the previous verdict. Since no remark was made during trial or deliberations about that previous verdict, it may very well be that Mrs. Peters or Mrs. Verda drew just such an inference. However, though I raise this point as a possibility, whether they did or did not do so marks precisely the boundary past which the court's inquiry cannot go: the realm of a juror's "mental processes."

### The Law

As previously stated, the law requires that an evidentiary inquiry such as this "be limited to objective demonstration of extrinsic factual matter disclosed in the jury room." *United States v. Howard,* 506 F.2d at 869. *United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.1979). The reason for requiring an "objective demonstration," i.e. some overt act that can be put to proof, was explained fully in *United States v. Howard:*

> Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms

misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard.

506 F.2d at 869, note 3. Accord, *United States v. Eagle*, 539 F.2d 1166, 1170 (8th Cir.1976).

In this case, *nothing* was disclosed in the jury room prior to a verdict on all three counts. As such, the inquiry mandated by *United States v. Howard* is complete [13] and the motion for new trial due to misconduct affecting the jury must be denied.[14]

See also 5 Cir., 722 F.2d 1175.

13. Notwithstanding the fact that no extrinsic factual matter was disclosed in the jury room, by a backdoor kind of "objective demonstration," it is clear that Mrs. Bell knew of the "housewives" comment during deliberations. For the sake of completeness, I feel compelled to determine if there was a "reasonable possibility" that her knowledge was prejudicial to the defendant.

I find there was no such possibility. Mrs. Bell swore that she did not know the verdict of the previous trial. And, contrary to defendant's assertions, I do not find it at all "obvious" that anyone who knew of Senator O'Keefe's "housewives" comment would realize the earlier trial was adverse to the defendant. The comment is subject to multiple interpretations, any of which would require drawing certain deductions from the bare comment, and Mrs. Bell swore that she did not draw the one which *might* be prejudicial to the defendant.

In that regard, however, it cannot be overlooked that eleven jurors, without any knowledge of the defendant's views on housewives, reached the same result as Mrs. Bell. I believe it would be patently unreasonable to conclude that but for her knowledge of the "housewives" comment, Mrs. Bell would have been the one juror to maintain, steadfastly and unalterably, the defendant's innocence. And, without such a conclusion, there is no "reasonable possibility" that the defendant was prejudiced.

14. *United States v. Williams*, 568 F.2d 464 (5th Cir.1978) does not compel a different result. The posture and facts of this case are substantially different from Williams. In Williams, two jurors had found out on the third day of trial that the defendant had been convicted in a previous trial. The judge ascertained this fact immediately, yet denied a motion for mistrial.

In its decision, the Fifth Circuit did not even mention *United States v. Howard* or Rule 606 of the Federal Rules of Evidence, for none of the policy concerns about the stability of jury verdicts and the attendant limits of a post-verdict inquiry were implicated. The district court knew before any verdict that two jurors possessed the most "damning" of information. 568 F.2d at 471. Here, no juror possessed such information. See note 13, supra.