UNITED STATES of America, Plaintiff,

v.

Victor POSNER, Defendant.

No. 82–352–Cr.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 26, 1986.

As Amended Oct. 17, 1986.

K. Chris Todd and Neal Cartusciello, Asst. U.S. Attys., S.D.N.Y., New York City, for plaintiff.

Edward Bennett Williams, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING NEW TRIAL IN FAVOR OF THE DEFENDANT, VICTOR POSNER

SPELLMAN, District Judge.

This Court *sua sponte* conducted a series of four in camera juror investigations approximately one month following the conviction of the Defendant, Victor Posner. The Court ordered these in camera sessions to determine the existence of possible juror misconduct that would give rise to the warranting of a new trial. After reviewing the testimony of all jurors participating in the verdict, and finding that the jurors received extrinsic prejudicial information during both trial and deliberations, this Court must grant the Defendant a new trial.

## I. BACKGROUND

On July 18, 1986, a twelve member jury consisting of eleven women and one male convicted the Defendant, VICTOR POSNER, of ten counts of tax evasion. The Defendant is a well known financier and a controlling shareholder in over 40 corporations. On the third day of Mr. Posner's first trial held in 1984, this Court severed the Government's case against Mr. Posner and his co-conspirator, William Scharrer. On August 14, 1984, a jury found Mr. Scharrer guilty of a conspiracy in aiding and abetting Mr. Posner to defraud the federal government. The Defendant alleg-

edly claimed a tax deduction to which he was not entitled. The Government's theory was that Mr. Posner inflated the value of a parcel of land that he donated to a Miami college.

Following the jury verdict on July 18, 1986, in camera juror interviews brought to the Court's attention certain extrinsic information[1] that the jury received and discussed during trial and at the time of deliberations that the parties did not present in evidence and that the jury received without the Court's knowledge.[2]

During the course of these in camera sessions,[3] the Court listened to the testimony with an eye toward uncovering whether any outside influences or material information came to the attention of the jury at any time during trial or deliberations. These in camera interviews gave rise to the unmistakable and unfortunate conclusion that improper extrinsic influences made its way into the jury room. Furthermore these extrinsic matters had a reasonable possibility of influencing the jurors in a way that may have prejudiced the verdict and deprived the Defendant of receiving a fair trial. In their response to an order to show cause why this Court should not grant a new trial, the Government stated

that the burden that the law places upon them is an impossible one to meet and that they could not oppose the granting of a new trial.[4]

This Court agrees with the Government that the burden is virtually insurmountable because the Court cannot inquire into the mental processes of a juror to determine the effect such information may have had on the verdict. Furthermore, the Court found and the Government concurred that the jury received outside information that lends itself to having a reasonable possibility of prejudice. Based on the above, this Court is compelled to conclude that the Defendant, Mr. Posner did not receive a fair trial.

## II. THE LAW CONCERNING IMPROPER JUROR CONDUCT

The sixth amendment assures a criminally accused defendant a panel of impartial jurors. Consistent with this constitutional requirement is the responsibility assigned to the trial judge for ensuring that the jurors are in fact impartial, and that the jury verdict is not in any way tainted by improper outside influences. *Sheppard v. Maxwell*, 384 U.S. 333, 362–

1. As of September 9, 1986 and the issuance of an order to show cause why a new trial should not be granted, this Court has released the contents of each juror's testimony for public inspection.

2. The Wall Street Journal presented the first reporting of outside material brought to the attention of the jury. In that article, juror Arlyn Albert was quoted as saying that there was "some information tossed around in the jury room that I don't think anyone would have known unless they had been discussing the trial or reading the paper." Cohn, *Jury Convicts Victor Posner of Tax Evasion*, Wall St.J., July 21, 1986, at 4, col. 1. The article also reported that Ms. Albert initially voted to acquit Mr. Posner, but later changed her vote for conviction.

The second instance in which the news media reported an instance of jury irregularity came one month later in the form of a news magazine article detailing the Victor Posner trial in a Sunday insert of the Miami Herald. In that story, Hilda Kersten, another juror, was reported to have made an independent investigation of the property site during the trial. During in

camera juror investigations, this Court discovered that she informed her fellow jurors of her visit and impressions concerning the property's true value and potential use. Dorschner, *An Embarrassment of Riches: Weep for Victor Posner. He has $200 million. But did he get a fair trial? The jury is still out.*, Miami Herald, August 31, 1986 (Tropic Magazine), at 8.

3. The Court conducted in camera juror interviews with all attorneys present so as to encourage frank and open discussion among the jurors in order to discover what exact outside influences came to the attention of the jury. The Court felt that an open public forum with cross-examination of the jurors would have a chilling effect on the kind of necessary fact finding that ultimately resulted from these interviews.

4. More specifically, the Government pointed out that because the law forbids asking a juror the effect that any evidence may have had on his or her vote, the burden then of convincing a court that extrinsic material did not have a reasonable possibility of tainting the verdict is one that the Government can almost never meet.

63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1965); *United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984).[4a] In keeping with this concern over juror impartiality, a court must be mindful that any contact which individual jurors may experience that is beyond the evidence presented at trial and that the jurors received without the knowledge or instruction of the trial judge is presumptively prejudicial. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *Perkins,* 748 F.2d at 1533 (11th Cir.1984). Moreover, once the defendant establishes or the court discovers the presence of extrinsic material finding its way into the jury room, the burden is then placed upon the Government to negate the presumption of prejudice. *Remmer,* 347 U.S. at 229, 74 S.Ct. at 451.

The Federal Rules of Evidence require that a court may at no time go behind the verdict and ask a juror what effect any evidence or information not presented in open court had upon the eventual outcome of the case.[5] This rule is often criticized because it may give rise to the granting of a new trial in situations where the extrinsic material had no actual bearing upon the jury's verdict. The rule requiring jurors to consider only the evidence presented in open court is designed to protect jurors from confusion and prejudice. Once confronted with evidence of improper juror conduct, however, courts are compelled to conduct an investigation that is limited in scope. It is for this reason that this Court only inquired into the extent and degree of outside material that found its way into the

jury room and not its effect upon the jury's ultimate decision.

The Fifth Circuit in *United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975), set the standard that this Court must follow in evaluating whether to grant a new trial. In that case, the court identified the standard that courts should use in applying Rule 606(b) of the Federal Rules of Evidence. When a court discovers the existence of extrinsic influences brought to bear upon the jury, the court must investigate the alleged impropriety. The court stated that

[t]he evidentiary inquiry before the district court … must be limited to objective demonstration of extrinsic factual matter disclosed in the jury room. Having determined the precise quality of the jury breach, if any, *the district court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant….* In this determination, prejudice will be assumed in the form of a rebuttable presumption, and *the burden is on the Government to demonstrate the harmlessness of any breach to the defendant.*

*United States v. Winkle,* 587 F.2d 705, 714 (11th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979) (quoting *Howard,* 506 F.2d at 869).

Courts routinely employ the use of in camera juror interviews as a means of determining whether extraneous information, not presented in open court, came to the attention of the jury and affected the final

---

**4a.** In the absence of sequestration of a jury, one must assume that they will accept and honor the responsibility to afford to the defendant a fair trial by deciding the case in issue based on what they hear and see in the courtroom and not on what they surreptitiously see fit by availing themselves of reports in the news media.

The framers of the Constitution never contemplated that the due process of law which affords to a defendant a fair trial under the Fifth, Sixth and Fourteenth Amendments would be achieved by gagging those entitled to freedom of speech and press under the First Amendment to the United States Constitution.

**5.** Rule 606(b) of the Federal Rules of Evidence states that

a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or to dissent from the verdict … *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror….*

Fed.R.Evid. 606(b) (emphasis added).

verdict. *See United States v. O'Keefe,* 586 F.Supp. 998 (E.D.La.1983) (investigating juror misconduct through the use of in camera questioning of all jurors with counsel present, and sealing the transcript of the hearing so as to make it a part of the record). This Court followed all of the requisite formalities in conducting its inquiry, including having all counsel present, and not exposing the jurors to cross examination in a public forum. Unfortunately, the task of uncovering the extent to which the jury received outside information is a lonely one for the court. Not only does the court perform the initial inquiry, but the responsibility for determining whether the extrinsic material gave rise to a reasonable possibility of prejudice also falls into the lap of the trial judge. Because a court is prevented from inquiring into the mental processes of a juror, a trial court is restricted in its questioning only to an examination of what outside matters entered into the jury room during trial and deliberations.

The investigation is designed to discover only the content of the extrinsic information which the jury may have received, not the effect that the outside influences may have had on the jury's verdict. The Court of Appeals for the Seventh Circuit in *Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir. 1984), stated the criteria that the trial court must follow when confronted with the unenviable responsibility of going behind the verdict after discovering the possible existence of juror misconduct.

> Rather than question the jurors directly, a district court must make findings of fact at two separate levels. First, the district court must find the basic, or subsidiary, facts—e.g., the nature, content and extent of the extra-judicial contact. Based on its findings of subsidiary facts, the district court must then make the ultimate factual determination: whether the contact likely affected the juror's impartiality.

*Owen,* 727 F.2d at 646 (citing *United States v. Vazquez,* 597 F.2d 192, 194 (9th Cir.1979); *United States v. Howard,* 506 F.2d 865, 868–69 (5th Cir.1975)).

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW [6]

■ The in camera juror interviews disclosed the reasonable possibility of harmful prejudice invading the jury deliberations and tainting the verdict in a way that denied Mr. Posner a fair trial. At least two of the jurors were aware of the previous conviction of Mr. Posner's former co-defendant, William Scharrer. The jury foreperson, Roger Bach,[7] admitted that on at least two occasions he read newspaper accounts of the trial. One article that he specifically identified reported that this Court had already convicted Mr. Scharrer. During a lunch recess about two weeks into trial, Mr. Bach discussed Scharrer's earlier conviction at a table including seven other jurors. Only juror Lori Mayer recalled hearing the remark. Although Ms. Mayer claimed that she was not aware of Mr. Scharrer's conviction until Mr. Bach's disclosure, Mr. Bach indicated that he thought Ms. Mayer was aware of this information even before their discussion.

> Mr. Bach is certainly not the only member of this jury panel who necessitated the granting of a new trial, but as compared with the other jurors, the foreperson most definitely paid the least amount of attention of them all to my instructions not to come into contact with outside sources of information. Although I have chosen not to find this jury in contempt of court, they are certainly the best candidates that I have ever seen for just such a sanction. I will say, however, that this jury, if existing in other jurisdictions around the country, would put those who engage in jury tampering as a profession out of business.

---

**6.** The narrative contains the Court's findings of fact and conclusions of law.

**7.** Up until a few months ago, only one other individual with the last name Bach earned a place in history for his contribution to the world. Added to this list is now Roger Bach, who through this case emerges as a new figure rivaling the accomplishments of even the great composer of the Brandenburg Concertos. Although the Court would be hard pressed to suggest that this district will remember Mr. Bach fondly as a model juror, he did, however, put on a clinic of some of the more interesting and harmful abuses of the jury system that any one juror could hope to achieve in a single trial.

During deliberations Ms. Mayer communicated to the other jurors the fact that the Court had convicted Scharrer. Ms. Mayer indicated that she inadvertantly disclosed this information because some members of the jury panel speculated as to why Mr. Scharrer had not testified. Other testimony indicated that Ms. Mayer brought the matter to the jury's attention at a time when the panel considered the unfortunate possibility of a "hung jury."[8]

On a separate matter, juror Hilda Kersten visited the property site that the Defendant claimed as a deduction on his income tax return. After this improper juror investigation, Mrs. Kersten communicated to fellow jurors her impressions as to the value of the property and the appropriate use for the land.

Finally, almost all of the jurors admitted that they should have called to the Court's attention the discussions about Mr. Scharrer's conviction and Mrs. Kersten's visit to the property site.[9] Despite their recollection that the Court had repeatedly warned against the receipt of outside influences,[10] the jurors remained silent until the in camera interviews brought to light the possible prejudice that these events may have had upon the trial's outcome.

This case presents two aspects of extrinsic information impermissibly brought to the jury's attention. The information about Mr. Scharrer's earlier conviction and Mrs. Kersten's independent investigation of the donated property are each evidence of extrinsic matters not received in open court. Either of these outside influences might raise a reasonable possibility that these statements prejudiced the jury in a way that denied Mr. Posner a fair trial.

In *United States v. Winkle*, 587 F.2d 705, 713–15 (5th Cir.1979), the court examined the possible prejudice that exists when a juror is aware of the previous conviction of a former co-defendant. The Fifth Circuit ruled that had the trial court charged the defendant for the same crime for which his co-defendant had already been convicted, then the presence of such extrinsic evidence would have certainly given rise to a finding of harmful prejudice. Similarly, in *United States v. Heller*, 785 F.2d 1524, 1528 (11th Cir.1986), the court faced a situation where one of the jurors questioned an accountant who lived in the same apartment building as to the significance of some of the evidence presented in a tax evasion case. The Eleventh Circuit found that such extrinsic evidence, which really amounted to an independent juror investigation, was not only improper, but also prejudicial and warranting of a new trial. *See also In Re Beverly Hills Fire Litigation*, 695 F.2d 207, 213–15 (6th Cir.1982),

---

**8.** There is some question as to what prompted Ms. Mayer to discuss Scharrer's conviction during deliberations. Ms. Mayer claims that she made her comment for the same reasons that Mr. Bach, at lunchtime during the second week of trial, communicated to several jurors that the Court had already convicted Scharrer; namely, the general curiosity surrounding Scharrer's failure to testify. During the September 8, 1986 in camera session, however, some of the jurors felt that Ms. Mayer, fearing the possibility of a hung jury, made her comment so as to persuade those who, on the first ballot, voted to acquit Mr. Posner. Similarly, other jurors felt that Ms. Mayer made the comment not because of a concern over a hung jury, but rather as a means of prejudicing Mr. Posner and persuading those who would have otherwise voted for acquittal that Scharrer's conviction was in some way suggestive of Posner's own guilt as well.

**9.** The in camera juror interviews revealed that the jury engaged in continuous discussions about the case, possibly not limited to the specific instances of juror impropriety.

**10.** For the record, this Court on each day of the trial, both before each session began and at the end of each day's proceedings, issued the following statement to the jury.

MORNING SESSION:
My age-old question: Has anybody read, listened to or watched any news whatsoever? You certainly haven't read, listened to or watched anything about this case. Is there any of you that feels that you need to call anything to the Court's attention which would in any way impact on you ability to be fair and impartial?

AFTERNOON SESSION:
Please, again, let me caution you, do not read, listen to or watch anything about any news report at all.

Please don't discuss this case among yourselves or allow it to be discussed in your presence.

*cert. denied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983) (finding prejudice where a juror conducted an independent investigation of electrical wiring in his own home and communicated his results to fellow jurors).

The cumulative effect of these findings raise the reasonable possibility of prejudice warranting of a new trial. This Court is obviously disappointed that those jurors who were not the primary violators failed to understand their duty and responsibility to communicate to the Court the improper conduct of some members of the panel. In the Court's opinion, this reflects a lack of personal discipline and common purpose that all jurors are expected to share. More tragic, however, is the tremendous waste of judicial resources that this case consumed in conducting a month long ordeal without reaching a final verdict capable of ensuring a fair trial for the Defendant.

This Court is persuaded through the in camera testimony and the above described findings that there is uncontroverted evidence of extraneous material impermissibly brought to the jury's attention both through trial and during deliberations. These findings take the Court past the first prong of the *Howard* criteria. This Court also concludes that there was a reasonable possibility that such extrinsic influences were prejudicial to the Defendant, Mr. Posner, receiving a fair trial. Moreover, the Government has conceded that it cannot carry its burden of showing that these circumstances did not give rise to prejudice sufficient enough to compel this Court to order a new trial.

■ It is well settled that a trial court should issue a new trial upon finding that outside prejudicial influences resulted in juror misconduct. *United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984). Although the Federal Rules of Evidence make it difficult to detect the existence of a jury's exposure to outside influences, when a court is confronted with unmistakable

evidence of juror impropriety, the proper course of action is to grant a new trial. *See generally* Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b),* 57 Neb.L. Rev. 920, 943–44, 948–50 (1978); Project, *Fifteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1984–1985,* 74 Geo. L.J. 793–800 (1986).

Based upon the above and foregoing, it is ORDERED AND ADJUDGED as follows:

1. The Court's adjudication of Victor Posner adjudicating him guilty of ten counts of income tax evasion be and the same is VACATED;

2. The jury verdict finding Victor Posner guilty of ten counts of income tax evasion be and the same is hereby VACATED;

3. The Defendant's motion for a new trial be and the same is hereby GRANTED; and the defendant be and he is hereby awarded a new trial.

4. This cause be and the same is hereby set for jury trial commencing on April 6, 1987, at the United States Courthouse, Miami, Florida, Courtroom 7.[11]

11. At this time, the Court is inclined to sequester any future jury asked to render a verdict in this case. This ruling is made without prejudice to

the parties' right to file any motions seeking to keep the jury unsequestered or requesting a change of venue.