**UNITED STATES of America**

v.

**Donald G. GAFFNEY, Maurice Bryant, Samuel Mosley.**

**No. 87–37–Cr–J–12.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Dec. 18, 1987.

John E. Steele, Stephen M. Kunz, Asst. U.S. Attys., for government.

Robert J. Link, Jacksonville, Fla., for defendant Gaffney.

Brent Shore, Jacksonville, Fla., for defendant Bryant.

Robert S. Willis, Jacksonville, Fla., for defendant Mosley.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR NEW TRIAL

MELTON, District Judge.

This cause is before the Court on defendants' motions for new trial, filed pursuant to Fed.R.Crim.P. 33. The motions were filed on August 10, 1987. Defendants, however, were given leave to file supplemental memoranda and exhibits related to the issue whether extrinsic evidence entered the jury room during the trial and during deliberations.[1] Joint supplemental memoranda of law in connection with the juror interviews were filed by defendants on August 19, 1987, and October 2, 1987. The government filed memoranda in opposition to defendants' motions for new trial on September 4, 1987, and October 27, 1987. The Court, having reviewed the arguments of counsel and the testimony of the jurors who rendered the verdicts in this cause, and having considered the law relevant hereto, has determined that the ends of justice dictate that defendants be given a new trial.[2] The basis of the Court's decision is set forth below.

---

1. On September 10, 1987, the Court interviewed each juror individually to determine whether extrinsic evidence in fact made its way into the jury room. The interviews were conducted in camera with court staff, counsel for the government, counsel for defendants, and defendants present.

2. The decision to grant defendants a new trial is based upon the Court's finding that outside information entered the jury room during trial and deliberations, and furthermore, that there was a reasonable possibility that this information was prejudicial to defendants. *See infra* pp. 1552–58. Therefore, it is not necessary for the Court to address the remaining issues raised by defendants in support of their motions for new trial.

## I. CHRONOLOGY OF EVENTS

Defendants Donald G. Gaffney ("Gaffney"), Maurice Bryant ("Bryant"), and Samuel Mosley ("Mosley"), in an indictment filed on February 26, 1987, were charged with one count of conspiring to obstruct interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. sec. 1951 (1982), various substantive counts of extortion, all in violation of the Hobbs Act, and eight counts of mail fraud, all in violation of 18 U.S.C. sec. 1341 (1982).[3] On June 25, 1987, the first day of trial, the Court granted defendants' ore tenus motion to dismiss the mail fraud counts pursuant to the holding of the United States Supreme Court in *McNally v. United States*, ⸺ U.S. ⸺, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[4]

The jury was selected on June 25, 1987. Thereafter, on June 29, 1987, counsel for defendants and counsel for the government were afforded the opportunity to present opening statements, after which the presentation of evidence began. All testimony was concluded by July 16, 1987, and closing arguments were completed on July 20, 1987. Jury deliberations began on July 20, 1987, and continued through July 24, 1987.[5]

During deliberations, on July 21, 1987, the jury foreman sent a message to the Court that one juror needed to be replaced because she had already made up her mind and would not discuss the case with the other jurors. The Court, after conferring with counsel, reinstructed the jury with regard to their duty to deliberate and reminded them that any verdict or verdicts they might reach had to be unanimous. The next day, July 22, 1987, the jury foreman informed the Court, by way of note, that the jury was deadlocked, and he doubted they would be able to reach a verdict on any of the counts. Thereafter, the Court gave the jury a modified *Allen* charge.[6]

The jury continued to deliberate and on July 24, 1987, reached verdicts as to thirteen of the fifteen counts charged against defendant Gaffney, and reached verdicts as to all counts charged against defendants Bryant and Mosley. The jury found defendant Gaffney guilty of three counts, acquitted him of ten counts, and was unable to reach verdicts on two counts. Defendant Bryant was found guilty of five counts and was acquitted of six counts.[7] Defendant Mosley was convicted of three counts and acquitted of one count. Each juror was polled individually and acknowledged his or her verdicts.[8]

Immediately after rendering their verdicts, three jurors made statements to the media, suggesting that extrinsic information had made its way into the jury room

---

**3.** With regard to the substantive charges of extortion, defendant Gaffney was named in fourteen counts, defendant Bryant in eleven counts, and defendant Mosley in three counts.

**4.** The Supreme Court in *McNally* held that the mail fraud statute (18 U.S.C. sec. 1341) does not prohibit schemes to defraud the citizenry of their intangible right to an honest and impartial government. This was the type of scheme the government alleged in the instant Indictment.

**5.** The trial of these defendants generated a great deal of publicity. The proceedings were reported daily in newspapers and on television and radio stations. The publicity was a result of defendant Gaffney's standing in the community and the fact that the crimes charged in the Indictment were alleged to have been committed while defendant Gaffney served as a Jacksonville city councilman. Defendant Gaffney is a well-known public figure in Jacksonville, having been a football standout in high school and college, having served on the city council from

1983 to 1985, and serving as a member of the state legislature since 1986.

**6.** *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); *see also* Pattern Jury Instructions, United States Eleventh Circuit, at p. 19, No. 6.

**7.** The Court had earlier granted defendant Bryant's motion for judgment of acquittal as to Count Six.

**8.** Specifically, defendant Gaffney was convicted on Counts One, Eight, and Eleven and found not guilty as to Counts Two through Seven, Nine, Ten, Fourteen, and Fifteen. The jury was undecided on Counts Twelve and Thirteen. Defendant Bryant was found guilty on Counts One, Four, Eight, Eleven, and Thirteen and was acquitted on Counts Two, Three, Five, Seven, Nine, and Twelve. Defendant Mosley was convicted on Counts One, Ten, and Eleven and was acquitted on Count Nine.

during trial and deliberations.[9] Additionally, one juror telephoned Robert J. Link, Esquire, co-counsel for defendant Gaffney, and corroborated that some of the jurors had in fact read and watched news accounts of the trial. Based on these statements, each defendant filed a post-trial motion to interview the jurors. The government filed a memorandum in opposition thereto. On August 19, 1987, the Court heard arguments on the motions. The Court decided that in the interest of justice the extraordinary measure of interviewing the jurors was necessary. The interviews were scheduled for September 10, 1987.

In formulating the questions for the juror interviews, the Court was guided by pertinent rules of law which limit such inquiries "to objective demonstration of extrinsic factual matter disclosed in the jury room." *United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975). According to Fed.R.Evid. 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Mindful of applicable law, the Court asked each juror individually the following questions:

1. Are you aware that any juror or jurors read newspaper accounts of the proceedings in this case during the course of the trial or during your deliberations?

2. Are you aware that any juror or jurors watched television reports with regard to the proceedings in this case during the course of the trial or during deliberations?

3. Are you aware of any other extraneous prejudicial information or matters other than newspaper or television reports that were improperly brought to the jury's attention?

4. Are you aware of any other outside influence that was improperly brought to bear upon any juror?

The Court asked appropriate follow-up questions, and gave counsel for all parties an opportunity to inquire of the jurors.[10] Upon completion of the interviews, defendants were granted a continuance until September 14, 1987, to present any additional witnesses but none were called.

Thereafter, counsel for defendants were allowed to supplement the record with newspaper articles and video tapes of television newscasts generated during the trial. On October 2, 1987, defendants filed a joint memorandum based on the information gleaned from the interview of the jurors, arguing that all defendants deserved a new trial because various acts of juror misconduct deprived them of their constitutional right to a fair trial. The government filed a response on October 27, 1987, in which it vigorously disagrees with defendants' position and urges the Court to deny defendants' motions for new trial.

## II. APPLICABLE LEGAL PRINCIPLES

### A. General Principles

Every person charged with a crime is entitled to a fair trial before an impartial jury of his peers. U.S. Const. amend VI. "The modern jury is conceived of as an institution that determines the

---

9. One juror made the following statement to the media:

I do not think it was fair the way they went about deliberating and stuff. They did not follow the Judge's rules. They even read newspapers and stuff like that concerning the trial and everything—and they're going to come in and tell us what they knew on the case that we don't know.

10. As noted *supra* p. 1547, note 1, the interviews were conducted individually and in camera. Holding the interviews in camera served the purpose of encouraging candid responses.

merits of a case solely on the basis of the evidence developed before it in the adversary arena." *United States v. Howard,* 506 F.2d 865, 866 (5th Cir.1975). A jury's verdict must be based solely upon evidence developed at trial. *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). As the United States Supreme Court noted in *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965),

> [i]n the Constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.[11]

■ A Court must initially engage in the presumption that a jury has been impartial and unbiased. *United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed. 2d 34 (1979); *United States v. Robbins,* 500 F.2d 650, 653 (5th Cir.1974). A defendant has the burden of proving juror partiality or bias and must do so by a preponderance of credible evidence. *Winkle,* 587 F.2d at 714; *United States v. Riley,* 544 F.2d 237, 242 (5th Cir.1976), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977). Partiality or bias may be shown by proving that extraneous influences were considered by the jury and tainted the jury's deliberation. *Winkle,* 587 F.2d at 714. The court in *United States v. Campbell,* 684 F.2d 141, 151 (D.C.Cir.1982) stated that " '[e]xtraneous influence' has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons...." Extrinsic information or outside influences brought to bear upon a jury may vitiate the presumption of impartiality because these extraneous matters tend to threaten consti-

tutional safeguards guaranteed to all criminal defendants such as those outlined by the Supreme Court in *Turner,* 379 U.S. at 472–73, 85 S.Ct. at 549–50: the right to confront accusers, the right to cross examine witnesses, and the right to be represented by counsel.

■ When there is an issue with regard to the propriety of a jury's conduct, it is the responsibility of the trial judge to ensure that the jury verdict is in no way tainted by improper outside influences. *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Once a court becomes aware that extrinsic influence or information may have been brought to bear upon the jury, it must investigate the alleged wrongdoing.

■ The parameters of a court's investigation of alleged juror misconduct were set out by the Fifth Circuit Court of Appeals in *Howard,* 506 F.2d at 869 (citations omitted):

> The evidentiary inquiry before the district court ... must be limited to objective demonstration of extrinsic factual matter disclosed in the jury room. Having determined the precise quality of the jury breach, if any, the district court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant.

Thus, as a threshold matter, defendants must establish that extraneous material did in fact make its way into the jury room. *Winkle,* 587 F.2d at 714; *see United States v. Ayarza–Garcia,* 819 F.2d 1043, 1051 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987); *United States v. Caporale,* 806 F.2d 1487, 1503 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). If defendants carry this burden, the Court then must determine whether there was a reasonable possibility of prejudice. *United States v. Perkins,* 748 F.2d 1519, 1533

---

**11.** In *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), Justice Holmes observed that "[t]he theory of our system is that the conclusions to be reached in a

case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

(11th Cir.1984); *see United States v. Spurlock,* 811 F.2d 1461, 1463 (11th Cir.1987).[12]

■ Upon finding that extrinsic material was in fact disclosed in the jury room, the Court must examine the nature, content, and extent of such material. Finally, if the Court finds that there exists a reasonable possibility that such matters were prejudicial, the Court further has to decide whether the government has rebutted the showing of prejudice. *Winkle,* 587 F.2d at 714. Should the government fail to rebut the showing of prejudice, defendants must be granted a new trial.

### B. Framework of Analysis

■ As noted above, in its inquiry of the jurors, a court may not ask a juror how outside information or evidence affected the verdicts reached.[13] A court may only attempt to ascertain what extrinsic matters, if any, were disclosed in the jury room. In its determination whether such outside information was prejudicial to a defendant, a court employs certain presumptions which hinge upon the nature and extent of the information to which the jury was exposed. These presumptions are best understood in the context of the specific improprieties alleged to have occurred in this case.

Defendants contend the following extraneous matters were disclosed during trial and deliberations in the jury room: (1) the Court's denial of defendants' motions for judgment of acquittal; (2) the criminal record of defendant Bryant; (3) information that a juror had been contacted improperly about the case during the trial; (4) conversations between a juror and an attorney-friend of the juror; (5) news stories about the case; and (6) discussions with friends and relatives about the case. According to defendants, the individual or cumulative effect of these outside influences

clearly establishes that they were denied a fair trial.

For the purpose of discussing the pertinent legal precepts with regard to determining whether defendants were prejudiced by such matters, the above-mentioned circumstances can be divided into two categories: (1) third-party contact with jurors; and (2) the jury's exposure to information from the media about the case.

■ The first form of extraneous influence, third-party contact with jurors, once proven by a defendant, creates a presumption of prejudice and shifts the burden to rebut such prejudice to the government. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *United States v. Perkins,* 748 F.2d at 1533. Failure to negate the presumed prejudice results in a new trial.

■ With regard to the second form of extraneous influence, exposure to information from the media, the presumption of prejudice, once it is shown such information was disclosed in the jury room, is not automatic. Case law offers guidance as to when disclosure of publicity in the jury room triggers a presumption of prejudice.

■ In *Gordon v. United States,* 438 F.2d 858, 874 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 142, 30 L.Ed.2d 56 (1971), the Fifth Circuit Court of Appeals stated that "where publicity prior to and during a trial is neither inherently prejudicial nor unusually extensive, the accused must assume the traditional burden and show actual jury prejudice." The scope of the "inherently prejudicial" prong has been further elaborated upon by various courts. Specifically, news of a defendant's prior criminal record disclosed to a jury is "inherently prejudicial". *See Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44

---

**12.** According to case law, whether defendants were prejudiced is a factual determination left to the trial court's "large discretion". *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959); *United States v. Manning,* 440 F.2d 1105, 1112 (5th Cir.), *cert. denied,* 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971).

**13.** The court in *United States v. Posner,* 644 F.Supp. 885, 887 (S.D.Fla.1986) pointed out the difficulty presented by such a limited inquiry: "This rule is often criticized because it may give rise to the granting of a new trial in situations where the extrinsic material had no actual bearing upon the jury's verdict."

L.Ed.2d 589 (1974); *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed. 2d 1250 (1958); *United States v. Williams*, 568 F.2d 464, 469 (5th Cir.1978).[14]

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The in camera juror interviews revealed that a myriad of extraneous information made its way into the jury room during the trial and the deliberations. The Court reaches this conclusion after carefully studying the testimony of each juror and after taking into account each juror's demeanor before the Court during the interviews. The Court's task of making factual findings in this cause is extremely difficult because of the inconsistencies in the respective testimony of the various jurors. The range of responses to the questions posed by the Court is perplexing. Some jurors suggested that fellow jurors discussed news reports in the jury room on a daily basis, while other jurors denied that any extrinsic material was disclosed in the jury room. The truth lies at some point in between these two extremes. Some jurors may have exaggerated the misconduct of their fellow jurors. Others may have been either oblivious to the improprieties that took place in the jury room or less than candid in telling the Court they observed absolutely no wrongdoing. In the final analysis, the Court has to judge the credibility of each juror, *see Smith v. Phillips*, 455 U.S. 209, 216, 102 S.Ct. 940, 945, 71

L.Ed.2d 78 (1981), distinguish the believable from the unbelievable, and determine the content, cumulative nature, and extent of the outside information that reached the jury room. *See Williams v. Griswald*, 743 F.2d 1533, 1538 (11th Cir.1984).[15] Upon consideration of the juror interviews, the Court finds that defendants have proved by a preponderance of the evidence the following: (1) Several jurors heard or discussed in the jury room the fact that the Court denied defendants' motions for judgment of acquittal; (2) Several jurors were aware of and discussed in the jury room defendant Bryant's prior criminal record; (3) A number of jurors watched television news reports of the trial, listened to radio reports about the trial, and read newspaper stories concerning the trial; (4) Jurors who were exposed to media reports discussed the contents of such reports to varying degrees; (5) At least two jurors were aware of the fact that a juror had been contacted by an individual outside the courtroom who told her not to believe what she was hearing in the courtroom; (6) A juror had a discussion with an attorney-friend that may or may not have been related to the case, but was disclosed in the jury room during deliberations and was perceived by other jurors as a discussion about various legal aspects of the trial; and (7) Some jurors discussed the case with their spouses and related the fact that they had these discussions to other jurors.[16]

---

**14.** The presumption of prejudice raised by publicity is based on the supervisory power of the federal courts to devise standards for the enforcement of the federal law and is not founded upon constitutional grounds. *Marshall*, 360 U.S. at 313, 79 S.Ct. at 1173; *Williams v. Griswald*, 743 F.2d 1533, 1537 (11th Cir.1984).

**15.** This Court concurs with the sentiments expressed by Judge Spellman when he faced a similar situation in *United States v. Posner*, 644 F.Supp. 885, 886 (S.D.Fla.1986):

Unfortunately, the task of uncovering the extent to which the jury received outside information is a lonely one for the court. Not only does the court perform the initial inquiry, but the responsibility for determining whether the extrinsic material gave rise to a reasonable possibility of prejudice also falls into the lap of the trial judge.

**16.** For the record, the Court gave the following instruction to the jury on June 26, 1987:

Now, at this point, ladies and gentlemen, this again is very, very important. I hope everything I'm telling you is important or I wouldn't be reading it to you and telling you about it. But these are things that are most imperative. You must avoid reading any newspaper articles that might be published about the case now that the trial has begun. That means anything about the case. Not something that you may think, "Well, this isn't very important." That means anything about the case.

You must also avoid listening to or observing any broadcast news program on either television or radio in which this case is mentioned. If you happen to be around a radio or a television and this case is brought up, please leave immediately. Don't listen to anything about the case, any report whatsoever.

There is no magic formula for deciding whether extrinsic material disclosed in the jury room was reasonably prejudicial. The determination in each case in which such an issue is presented must be evaluated in light of its own unique circumstances. In the instant case, none of these improprieties standing alone would necessarily rise to the level of prejudice necessary to warrant a new trial. The cumulative effect of the aforementioned findings, however, raises the reasonable possibility of prejudice. Accordingly, the Court's only choice is to grant defendants' motions for a new trial.[17] Below is a brief discussion of the above-mentioned factual findings.

### A. Failed Motions for Judgment of Acquittal [18]

Defendants moved for judgments of acquittal at the close of the government's case in chief and at the close of all the evidence. The Court granted defendant Bryant's motion as to Count Six and denied the motions as to all other counts and defendants.

A motion for judgment of acquittal is traditionally raised outside the presence of the jury. The underlying reason is to avoid the jury's consideration of a court's denial for such a motion as a reflection of the court's view of the guilt or innocence of the accused. *United States v. Coke*, 339 F.2d 183, 186 (2d Cir.1964). The standard by which a court determines whether to grant a motion for judgment of acquittal differs greatly from the standard by which a jury decides the guilt or innocence of a defendant.

The discussion by jurors of defendants' failed motions for judgment of acquittal gives rise to the possibility of prejudice. As the court in *United States v. Diharce–Estrada*, 526 F.2d 637, 641 (5th Cir.1976) recognized, in some instances the "perfunctory denial of an acquittal motion in open court presents the danger that the jury will believe that the trial judge is expressing his opinion that defendant is guilty. In a close case where no cautionary instruction is subsequently given, this danger is increased." Although the denial of the motions for judgment of acquittal in this case did not take place in the presence of the jury, the disclosure of the information in the jury room created the same problems discussed by the *Diharce–Estrada* court.

While the Court recognizes that all publicity to which a jury is exposed does not create a presumption of prejudice, the Court is of the opinion that in this case the jury's knowledge of the Court's denial of the motions for judgment of acquittal, when combined with the other improprieties, establishes there was a reasonable possibility of prejudice. In fact, when the Court granted Bryant's motion for judgment of acquittal as to Count Six, the Court specifically inquired of counsel as to

---

And try to avoid any local programs to the extent that you can, because of the fact that something may be mentioned on it in your presence. So it's very, very important that you avoid this.

The reason for these precautions, of course lies in the fact that it will be your duty to decide this case solely on the basis of the testimony and evidence presented during the trial without consideration of any other matters whatsoever.

*Also, the Court instructed the jury at the end of each trial day to this effect:*

I remind you not to discuss the case among yourselves or with anyone else. And I also remind you again not to read anything about the case, listen to or hear anything on television or radio or any other method of media.

**17.** The Court's reluctance to grant a new trial is founded upon its belief that trial by jury is the cornerstone of our criminal justice system. Once a jury renders a verdict, that verdict should stand absent the most extraordinary circumstances. The Court recognizes, however, that the jury process can fail to function properly from time to time. When this happens, a court must act to rectify the wrong and in doing so, it reinforces the fundamental integrity of the system.

**18.** For an example of the discussions that took place regarding defendants' failed motions for judgment of acquittal, see the transcript of the juror interviews ("T.") at pp. 80–81. The Court, by making reference to these specific pages, is not recognizing that the testimony contained therein is more credible than other testimony, but is merely making reference to descriptions that in the Court's view represent the impropriety being scrutinized. This qualification pertains throughout this order.

whether this should be mentioned to the jury or simply deleted from the Indictment without informing the jury. Counsel requested that the jury not be instructed in order to avoid the impression that the Court had otherwise passed judgment on the remaining counts. Therefore, fairness allows but a single conclusion: The fact that the Court's denial of defendants' motions for judgment of acquittal was disclosed in the jury room, when viewed in conjunction with other juror misconduct, leads to the inescapable conclusion that there was a reasonable possibility of prejudice to defendants.

### B. Defendant Bryant's Prior Criminal Record [19]

Defendant Bryant decided not to testify in this case, yet his prior criminal record became "hidden" evidence to which the jury was exposed. The inherently prejudicial nature of prior convictions is recognized in the Federal Rules of Evidence insofar as the rules limit the use of evidence of prior convictions. Fed.R.Evid. 609(a) allows the admission of a defendant's prior conviction to attack the credibility of defendant should he become a witness. However, to be admitted into evidence, the prior crime or crimes must meet one of two requirements set forth in Rule 609(a): (1) The crime had to have been punishable by death or imprisonment in excess of one year under the law under which the witness was convicted; [20] or (2) The crime had to involve dishonesty or false statement, regardless of the punishment. Fed.R.Evid. 404(b) permits evidence of prior crimes only when they are relevant to the proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in the case being tried.

While it is clear that there is a reasonable possibility defendant Bryant was prejudiced by the disclosure of his prior convictions, a more difficult issue is whether the other defendants were prejudiced by the invasion of this information into the jury room. Since all three defendants were charged with conspiracy in Count One of the Indictment, each defendant was individually responsible for the actions of the other defendants perpetrated in furtherance of the alleged conspiracy.[21] Therefore, it is readily apparent that the prejudice suffered by defendant Bryant could have spilled over to the other defendants. Accordingly, the Court concludes there was a reasonable possibility defendants Gaffney and Mosley were prejudiced by the jury's knowledge of defendant Bryant's prior criminal record, especially when that information is considered togeth-

**19.** One of the jurors testified that he heard a radio news report in which defendant Bryant's criminal record was discussed. He could not recall whether he told all the members of the jury about the report, but said that he shared the information with "at least one or more" of the other jurors. *See* T. at pp. 136–38.

**20.** Additionally, to meet this requirement, the probative value of admitting this evidence must outweigh its prejudicial effect to defendant.

**21.** The Court gave the following *Pinkerton* instruction to the jury:

If you find that the defendant is guilty of conspiracy as charged in Count One of the Indictment, you may also find the defendant guilty of attempted extortion or extortion as charged in Counts 2–15 of the Indictment, or all or these, provided you find the essential elements of extortion and attempted extortion have been established beyond a reasonable doubt; provided you also find beyond a reasonable doubt:

*First:* That the extortions and attempted extortions were committed pursuant to the conspiracy;

*Second:* That the extortions and attempted extortions were reasonably foreseeable consequences of the conspiracy alleged in Count One; and

*Third:* That the defendant was a member of the conspiracy at the time the extortions and attempted extortions were committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the extortion or attempted extortion.

The reason for this is that a co-conspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of other conspirators as to acts which are reasonably foreseeable.

*United States v. Pinkerton,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *see United States v. Alvarez,* 755 F.2d 830, 848 (11th Cir.1985), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 2489, 96 L.Ed.2d 380 (1987).

er with the plethora of other improprieties that took place in the jury room.

## C. News Accounts of the Trial [22]

■ As noted earlier, defendant Gaffney is a well-known public figure in the Jacksonville community. *See supra*, p. 1548, note 5. The crimes for which he was charged were directly related to the position he held as a city councilman from 1983 to 1985. Consequently, the trial received daily media coverage. A number of jurors admitted watching television news accounts of the trial and reading about the trial in the newspapers. Additionally, some jurors testified that other jurors frequently discussed what they had read, seen, and heard about the case.

In its determination that the exposure of some jurors to media reports about the case and the discussion of these reports in the jury room contributed to the prejudice suffered by defendants, the Court finds instructive the Supreme Court's teachings in *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (citation omitted):

> The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Generalizations beyond that statement are not profitable, because each case must turn on its special facts.

The special facts of this case which compel a finding of prejudice include, among other things, defendant Gaffney's position in the community, the extensive media coverage of the trial, and the multiple outside influences that were disclosed in the jury room during the trial and deliberations.

Moreover, the Court is of the opinion that the facts of this case satisfy the requisites for showing prejudice as set forth in *Gordon v. United States*, 438 F.2d at 874, discussed *supra* at p. 1551. That is, the

news reports about this case were extensive, and a number of them could be viewed as containing inherently prejudicial material.

## D. Jurors' Awareness of Improper Contact with Fellow Juror [23]

■ During the trial, the government notified the Court that an individual may have made improper contact with one of the jurors outside of court.[24] Having determined that the matter necessitated an investigation, the Court conducted an in camera interview of the juror's work supervisor on July 22, 1987, with all counsel and defendants present. *See* Transcript of In Camera Interviews, July 22, 1987, at pp. 2–10. The supervisor told the Court that during the course of the trial the juror called her from time to time to tell her whether a replacement employee would still be necessary. *Id.* at 4. During one of these conversations, the juror said that while she was at her mother's house one of defendant Gaffney's brothers approached her and said, "I hope you don't believe all that, you know, garbage they're feeding you." *Id.* at 5. The juror stated that this incident made her a little nervous and upset. *Id.* at 6.

The supervisor further testified that she had not contacted anyone about her conversation with the juror, but was contacted by an F.B.I. agent prior to the hearing that day. *Id.* at 9–10. The Court declined to investigate further as to how the information about the conversation came to light since it was not relevant to the issue then before the Court. *Id.*

In view of the supervisor's testimony, the Court decided it was necessary to interview the juror in question. The interview was conducted by the Court in chambers and in the presence of all counsel and defendants.

---

**22.** For a flavor of the statements jurors gave to the Court with regard to the introduction of news accounts into the jury room, see T. at pp. 6, 62, 128–30, 142–52.

**23.** A description of this extraneous matter can be found in T. at pp. 15–16, 119–20.

**24.** The improper contact occurred about two weeks before it came to the attention of the Court. *See* Transcript of In Camera Interviews, July 22, 1987, at p. 5.

According to the juror, when she was leaving her mother's house, a person in a car stopped and said, "Are you ready for another day, a long day?" *Id.* at 12. The juror answered in the affirmative. The person in the car then said, "Well, I hope you don't believe all that stuff they're feeding you." *Id.* At this point in the brief conversation, the juror recognized the person's face but did not know his name. Then, she ended the conversation by telling him that she had an open mind. *Id.* The juror testified that the incident made her nervous initially, but not later. *Id.* at 13.

The Court then queried the juror to determine whether she had related this event to other jurors. She said she had mentioned it to some jurors, but was not sure how many jurors actually heard the discussion. The juror recalled that she told her fellow jurors the same thing she had told the Court. *Id.* at 13–14.

Having determined that the incident had not tainted the juror who had been contacted, the Court asked her whether she could remain fair and impartial and whether she could remain open-minded. She answered these questions satisfactorily. *Id.* at 16.

When the jury was interviewed on September 10, 1987, two jurors said they had some knowledge of the improper contact. One juror had a general recollection of discussions about the incident taking place when the juror involved returned to the jury room after the in camera interview discussed above. *See* T. at pp. 15–16. She could not recall specifically what was said.

The other juror recollected a specific dialogue he and the juror who had been contacted had shortly after the incident. While walking in the courtroom either to or from the jury room, she pointed out the individual who she thought had approached her and said she thought the person was one of defendant Gaffney's brothers. She also said she was frightened because "they" knew where she lived.[25] T. at p. 119–20.

The prejudicial nature of this type of contact is clear: A juror might assume one of the parties was responsible for the contact and based upon that presumption, decide the merits of the case against that party. *See, e.g., Stimack v. Texas,* 548 F.2d 588 (5th Cir.1977). In the case at bar, the Court interviewed the juror who had been contacted to ensure her impartiality. Based on her responses to the Court's questions, the Court and all parties were satisfied that she remained qualified. However, the Court cannot say with absolute certainty that the incident did not prejudice other jurors who were told of the incident.[26]

The juror who recalled the identification of one of defendant's brothers as the person who made the improper contact may have been prejudiced. The Court was precluded by law from asking him directly whether the incident affected his verdicts. *See supra* p. 1549. The Court, however, can infer from the suggestion he made to his fellow juror that she report the incident to the Marshal, *see supra* p. 1556, note 25, and from his testimony that she was scared because "they" knew where she lived, that he believed someone related to defendant Gaffney improperly contacted a juror. *See supra* p. 1556.

As the Court noted *supra* p. 1551, any third-party contact with the jury is presumptively prejudicial, and the government bears a heavy burden in attempting to rebut that presumption. The circumstances surrounding this particular event reasonably suggest that at least one juror was prejudiced. According to applicable case law, if just one juror receives prejudicial off-the-record information the prejudicial effect spills over and is viewed as having tainted all jurors. *See United States v. Delaney,* 732 F.2d 639, 643 (8th Cir.1984); *United States v. Rattenni,* 480 F.2d 195, 198 (2d Cir.1973) (stating that "a

---

**25.** The juror to whom the incident was being related told the juror who had been contacted that she should tell one of the Marshals about the incident.

**26.** Thus the determination of the prejudicial nature of this extrinsic information does not turn on the actual contact itself but rather on what other jurors knew about it.

defendant is entitled to twelve fair and impartial jurors").

The Court cannot say unequivocally that this incident influenced the jury's verdicts. But, the law does not require it to do so. Clearly, these circumstances, when viewed with other improprieties, create more than a reasonable possibility defendants were prejudiced.

### E. Discussions Between Juror and Juror's Attorney–Friend

 Two jurors testified that another juror discussed various legal matters pertaining to the case with an attorney-friend and related the contents of the discussion to other jurors. The information alleged to have been relayed to the jury involved procedural matters and the consequences of various verdict combinations.[27] The juror who allegedly had the conversation told the Court that he telephoned an attorney-friend during deliberations and thought he might have mentioned it in conversations with other jurors.[28] He denied, however, that he discussed the case with this friend. *See* T. at pp. 146–48.

 Discussion between a juror and legal counsel is an extraneous influence which the Court must view as presumptively prejudicial. Independent advice received by a juror from an attorney that is relayed to the jury during deliberations is somewhat analogous to the situation with which the Eleventh Circuit Court of Appeals was presented in *United States v. Heller*, 785 F.2d 1524 (11th Cir.1986). In *Heller*, a juror solicited the advice of an accountant regarding an issue in the case. The court held that it was reversible error to deny a motion for new trial when it was discover-ed that a juror had solicited such advice. *Id.* at 1528.

While the juror in question denied that he discussed the case with his attorney-friend, the statements of other jurors lead to the conclusion that some jurors believed he had in fact received advice from an attorney. These jurors recalled that the juror said he had talked about the case with his attorney-friend, and even the juror acknowledged that he mentioned a discussion with an attorney-friend in the jury room. However, he was unable to explain why he might have mentioned it. The juror in question may have thought that the discussion was unimportant. Nevertheless, it is obvious other jurors viewed it differently. Whether it was his intention or not, some jurors perceived that this juror was relying on his attorney-friend as authority to support various legal positions. When combined with the multitude of other breaches, the intrusion of this impermissible information into the jury room rendered the trial of defendants unfair.

### F. Discussions with Relatives about the Case

 Two jurors readily admitted they discussed the case regularly with their spouses.[29] Others jurors testified that these two jurors revealed in the jury room the fact that they had these conversations. While these two jurors seemed to believe there was nothing improper about discussing the case with their spouses, such conversations were in direct contravention to the Court's repeated admonition not to discuss the case with anyone.[30]

---

**27.** One juror testified as follows:
 He said that he [another juror] had spoken with an attorney-friend of his that had called him or he had called him. And he said that there's no way why we should let the other boys take all of the blame.
 And he said that if we would find him guilty of any of the charges—I think, if I'm not mistaken, it was the first charge and the third, whichever ... that we would have to find him guilty of those two charges if we found him guilty of one of the charges. Whoever he had spoken with advised him of how we should vote to find him [Gaffney] guilty or not guilty. T. at p. 71

**28.** The juror told the Court that he could not remember why he had told other jurors about the conversation.

**29.** Examples of the jurors' testimony about the discussions they had with their spouses can be found in T. at pp. 135–36, 149–50.

**30.** As noted earlier, the Court admonished the jury daily "not to discuss the case among yourselves or with anyone else." Additionally, on July 2, 1987, the Court instructed the jury as follows:
 I remind you not to discuss the case among yourselves or with anyone else. In addition

■ Although the fact that some jurors discussed the case with family members does not in and of itself render the trial of defendants unfair, it creates the possibility that some jurors considered either evidence, issues, or opinions not considered by other jurors. Moreover, it simply increases the likelihood that some jurors voted to convict defendants after deliberating upon matters not presented in the courtroom during trial. Defendants have a right to trial before a jury free of such influences. When viewed together with the other instances of extraneous influences disclosed in the jury room, discussions with family members about the case cannot be dismissed as harmless.

## IV. GOVERNMENT'S POSITION

The government attempts to rebut the Court's finding that there exists a reasonably possibility disclosure of outside information in the jury room prejudiced defendants by analyzing the verdicts reached by the jury and by pointing to the conscientious effort the jury made to sift through the evidence and make factual findings.[31] Additionally, the government asserts that the jury's initial deadlock and its response to the *Allen* charge negates the notion that misconduct was a factor in the verdicts. Finally, the government contends the weight of the evidence clearly supports the jury's verdicts, confirming the proposition that the jury decided the case on the basis of the evidence and testimony presented in the courtroom.[32]

While the government's position may have some merit, the Court is unpersuaded. Too many extraneous matters of a prejudicial nature were disclosed in the jury room, affecting adversely the jury process. The Court cannot say with confidence that as a matter of law defendants received a fair trial before an impartial jury. That is, the Court is convinced that the verdicts rendered by the jury in this case were not based solely upon the evidence and testimony presented at trial. A review of the transcript of the juror interviews leads to the unmistakable conclusion that the jurors considered extrinsic material thus creating a reasonable possibility of prejudice to defendants. Unfortunately, this is one of those extremely rare instances where the Court has no choice but to vacate the verdicts of the jury and order a new trial. In this case, justice so demands.

Based on the foregoing, it is

ORDERED AND ADJUDGED:

1. That the jury verdicts finding Donald G. Gaffney guilty of one count of conspiring to violate the Hobbs Act and two counts of extortion in violation of the Hobbs Act are hereby vacated;

2. That the jury verdicts finding Maurice Bryant guilty of one count of conspiring to violate the Hobbs Act and four counts of extortion in violation of the Hobbs Act are hereby vacated;

3. That the jury verdicts finding Samuel Mosley guilty of one count of conspiring to violate the Hobbs Act and two counts of extortion in violation of the Hobbs Act are hereby vacated;

thereto, since it will be a rather long weekend because of the Fourth of July, I want to especially remind you at this time of the admonition and instruction that you're not to discuss this case among yourselves or with anyone else.

That's very important. That includes also members of your family. It's all inclusive. So please remember that.

**31.** With regard to the jury's deliberations, the government points out that the jury requested exhibit lists, transcripts, and the playing of one tape twice.

**32.** This is a summary of the government's attempt to rebut a finding of prejudice. In its

memorandum, the government vigorously challenges each instance of extrinsic material entering the jury room. The government's attack is twofold: first, it contends that defendants have for the most part failed to prove various matters were disclosed in the jury room and second, if such matters were disclosed, they were not prejudicial. In short, the Court is unpersuaded by the government's position for two reasons. First, the Court's view concerning the credibility of certain jurors differs from that of the government's. Second, the Court rejects the segmented analysis engaged in by the government. In this respect, the Court emphasizes that its decision to grant a new trial is based on the totality of the circumstances as they existed in the jury room.

4. That defendants' motions for new trial are hereby granted and defendants are awarded a new trial; and

5. That this cause is hereby set for jury trial commencing on Tuesday, February 16, 1988, at 9:00 a.m. in Courtroom No. 3 at the United States Courthouse, Jacksonville, Florida.